THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 56641, 60884, 67238. Promulgated October 30, 1935.

*Ferdinand Tannenbaum, Esq.*, for the petitioner.
*Chester A. Gwinn, Esq.*, for the respondent.

OPINION.

ARUNDELL: The respondent determined deficiencies in income tax for the years and in the amounts as follows:

| | |
|---|---|
| 1927 | $22,308.63 |
| 1928 | 20,637.53 |
| 1929 | 275,316.77 |
| 1930 | 341,763.68 |

Petitioner contests only a part of these deficiencies. Several issues were originally raised, some of which petitioner concedes have been settled by decisions of the Supreme Court. One issue, raised by respondent's answer, relating to a deduction for the mean of reserves for sickness and accident provisions in group insurance policies, has been settled by stipulation and respondent's concession that the stipulated 4 percent of the mean of such reserves may be deducted.

The questions for decision are: (1) Whether or not income was realized by petitioner in the amount of interest in default on mortgage loans where the mortgaged property was acquired by petitioner either by foreclosure or voluntary conveyance by the mortgagor; (2) whether or not petitioner is entitled to deductions for obsolescence of a building in the period March 27, 1929, to July 7, 1930. Some of the facts were stipulated and testimony was offered as to others.

### The Interest Issue.

Petitioner is a life insurance company operating on a mutual basis. In the course of its business it loaned money on real estate and accepted mortgages as security for the loans. In addition it purchased certain mortgages.

Upon default by the mortgagors the petitioner, as mortgagee, instituted foreclosure proceedings on certain of the mortgages. In jurisdictions which allowed the mortgagor a redemption period the petitioner bid for the properties at foreclosure sales amounts equal to the principal of the mortgage plus accrued interest. Its purpose in doing this was to fix the redemption price at an amount equal to the principal and interest. On foreclosure sales at which petitioner was the successful bidder it received a certificate of purchase or a deed to the property in exchange for the obligation of the mortgagor to pay both principal and accrued interest.

The accrued interest to the date of sale on the foreclosed mortgages in each of the several years was as follows:

| | |
|---|---|
| 1927 | $30, 898. 63 |
| 1928 | 88, 972. 16 |
| 1929 | 91, 768. 42 |
| 1930 | 178, 445. 88 |

The cases are uniform in holding that where a mortgage creditor bids in the property at foreclosure for the principal of the mortgage plus interest, the interest is to be treated as income to the creditors. *Ewen MacLennan*, 20 B. T. A. 900; *National Life Insurance Co.* v. *United States*, 78 Ct. Cls. 369; 4 Fed. Supp. 1000; *Missouri State Life Insurance Co.*, 29 B. T. A. 401; affirmed on this point, 78 Fed.

(2d) 778; *American Central Life Insurance Co.*, 30 B. T. A. 1182. Accordingly, we affirm the respondent's inclusion of the above amounts in petitioner's interest income.

In the case of other properties on which petitioner held mortgages, and there were defaults, petitioner secured title and possession by direct conveyance from the mortgagors and release of the mortgages in lieu of foreclosure proceedings. In such cases the indebtedness of the mortgagors was extinguished.

The accrued interest to the date of conveyance of the properties was as follows in each of the several years:

| | |
|---|---|
| 1927 | $5, 971. 65 |
| 1928 | 17, 716. 39 |
| 1929 | 26, 253. 21 |
| 1930 | 75, 207. 37 |

The question of treating as income accrued interest on property directly conveyed to the insurance company was involved in *Missouri State Life Insurance Co., supra.* The Circuit Court held:

The mortgagee in such a case exchanges the loan for the land. If the land is worth as much or more than the amount due upon the loan with accrued interest, the exchange results in the equivalent of payment in full, but not otherwise. Certainly, the accrued interest upon a mortgage is not paid by the acceptance of mortgaged property which is worth less than the principal of the loan. Such a transaction produces no income to the mortgagee.

In *American Central Life Insurance Co., supra*, promulgated prior to the hearing of these proceedings, we said:

If the properties were worth more than the loans, costs, and interest (and the record on this is silent), it could not be said that petitioner did not receive its interest. * * * We may assume, as the Commissioner did, that the mortgagee's debt for the interest was discharged by the transfer.

In the present case there is no evidence as to the value of the land taken in satisfaction of the indebtedness. At the hearing of these proceedings the presiding Member directly pointed out the possibility that the solution to the question here might depend upon the value of the property taken over by the petitioner. Counsel for the petitioner took the view that the value was immaterial and stated that no proof thereof would be offered. We may not assume that the property was worth less than the principal of the mortgage debt plus interest; if we must indulge in assumption it must be that the respondent was right in treating the property as of sufficient value to satisfy both principal and interest. We accordingly sustain the inclusion in income of the amounts above set out.

### *The Obsolescence Issue.*

On January 5, 1928, the petitioner purchased real estate and improvements thereon located at Nos. 86–88 Academy Street and Nos.

87–91 Bank Street, Newark, New Jersey, paying therefor the sum of $576,579.37. These properties adjoined and were in reality one parcel running through the block from Bank to Academy Streets, which were parallel, and will hereinafter be called the Academy Street property.

The Academy Street property was acquired pursuant to a resolution of petitioner's directors adopted in December 1927, reciting that in their judgment the growth of the petitioner's business " requires present provision for additional office space ", and ratifying the action of the president in contracting for the purchase of a number of parcels of land, including the Academy Street property, all of which were located within the block bounded by Washington, Academy, Plane, and Bank Streets. The improvements on the Academy Street property consisted of a warehouse building, five stories in height, of brick and heavy frame construction. The building had been used for a number of years prior to 1928 as a furniture warehouse by the owners, who conducted a retail furniture store a short block distant from the property. Because of the proximity of the warehouse to the retail store the owner did not desire to sell the warehouse property. There were other warehouses in the vicinity, and the fact of being close to the retail shopping district made the property desirable for warehouse purposes.

At the time the Academy Street property was purchased by the petitioner it was leased for a period of five years from January 5, 1928, at an annual rental of $20,000, the lessee to pay all taxes and expenses in connection with the property. The lease was subject to termination by the lessee on six month's notice. On March 27, 1929, the lessee gave notice and the lease was terminated on November 1, 1929. The petitioner attempted to persuade the lessee to continue the lease and also made efforts to secure other tenants, but without success. On July 7, 1930, the petitioner demolished the building. It had never been occupied in whole or in part by the petitioner.

The gross rental income from the property and the taxes and expenses in connection therewith for the years 1928 to 1931 were as follows:

| Year | Gross rents | Taxes and expenses |
|---|---|---|
| 1928 | $24,405.65 | $4,687.98 |
| 1929 | 21,182.79 | 5,397.86 |
| 1930 | 1,107.10 | 6,462.79 |
| 1931 | 4,408.91 | 1,940.44 |

The fact that the building was leased at the time the property was purchased was a factor that influenced the price paid by the peti-

tioner. The petitioner intended at that time to lease it for a longer period if possible. In 1929 conditions became less favorable for rental of properties in that vicinity. The removal of the former owner of the Academy Street property from that warehouse was an unfavorable factor; the failure of a number of retail establishments in what was known as " furniture row " adversely affected rentals; the occupants of some of the warehouses moved to other sections more conveniently located. It became evident to petitioner in 1929 that it would not be able to secure a tenant who would pay a rental approximating that paid by the then lessee, and the taxes and expenses in connection with the building were so high that it would be to the advantage of the petitioner to demolish the building.

In its returns for the years 1928, 1929, and 1930 petitioner claimed and was allowed the following amounts as deductions for exhaustion, wear and tear of the improvements on the Academy Street property: $10,344.66 for 1928, $10,487.94 for 1929, and $5,402 for 1930. The amounts so claimed and allowed are at the rate of 3 percent of the amount set forth in the returns as cost of the improvements.

Petitioner now claims that the improvements on the Academy Street property had a cost to it of $349,598.04, and that $336,631.40 thereof should be allowed as deductions for exhaustion, wear and tear, including obsolescence, in the period from March 27, 1929, to July 7, 1930. The difference between the above sums represents the 3 percent depreciation deduction claimed and allowed for the year 1928 and the period in 1929 to March 27.

Petitioner's view is that it purchased the Academy Street property for the purpose of leasing it; that at the date of the lessee's notice of termination, March 27, 1929, it was justified in concluding that in the following year it would be impossible to lease the warehouse, hence it was proper to charge off the unexhausted cost in the years 1929 and 1930. The respondent argues that petitioner is not entitled to an obsolescence deduction because the petitioner's acquisition of the property was primarily an acquisition of land and the building merely an encumbrance so far as petitioner's use for the property was concerned, but that if obsolescence is in theory allowable the petitioner has failed to establish the cost of the building, so that in any event the amount allowable can not be determined.

Assuming economic worthlessness of a building, and demolition, a corporate owner other than a life insurance company could claim a loss deduction for the unrecovered cost. Whether such a loss would be allowable we need not decide, but see *Liberty Baking Co.* v. *Heiner*, 37 Fed. (2d) 705. A life insurance company may not take loss deductions. It may, however, take a deduction of " a reasonable allowance for the exhaustion, wear and tear of property, includ-

ing a reasonable allowance for obsolescence." Sec. 203 (a) (7), Revenue Act of 1928.

At the outset, it appears to us that petitioner's alleged " cost " of the building, $349,598.04, is but little short of fantastic. The method of arriving at this figure, stated briefly, is that the value of the land was figured and that amount subtracted from the entire price paid by petitioner and the difference ascribed to the building. We see no sound basis for this method under the facts in this case. The petitioner unquestionably paid more for the property than its fair market value. This is established by the evidence, and was brought about by the petitioner's desire for the land and the fact that the owner was an unwilling seller. Petitioner's witnesses took into consideration this situation and by reason thereof added 100 percent to the basic front foot figure they used as a starting point in their calculations. Just why 100 percent was used, rather than some other figure, say 200 or 300, does not appear. There can be no doubt on the record that the vendor drove a hard bargain. But it did not bargain separately for the sale of the land and the building, and petitioner did not buy them separately. Petitioner's primary need was for the land. This is shown by the resolutions adopted shortly before the purchase, and by the evidence, which shows, among other things, that petitioner acquired the entire block in which this particular property is located. Other parcels in the block had other kinds of improvements wholly unrelated in possibility of use to petitioner's business or to the warehouse business conducted on the Academy Street property, which is at least an indication that the acquisition of the improvements was purely incidental to the purchase of the land. It is true that the fact that the building was leased influenced the price paid for the property. Nevertheless we are of the opinion that by far the major portion of the purchase price of the property should be allocated to the cost of the land.

The respondent offered the testimony of an experienced appraiser, who, on the basis of available data as to the type of construction of the warehouse building, computed the cost of reconstruction and the depreciated cost to the date of purchase by the petitioner.

Upon consideration of all the evidence, we are of the opinion that of the cost of the entire property the sum of $100,000 represents a reasonable amount to be allocated as cost of the building.

We still have the question of whether the petitioner is entitled to deductions for obsolescence. While the petitioner wanted and acquired the property primarily for the land, the building thereon was useful and was used as an income producer. The record does not establish to what extent the lease on the property affected the price paid by the petitioner, but the evidence is uncontradicted that it did exert some influence. Moreover, the evidence is that the peti-

tioner at the time of acquisition intended to lease the building for a number of years before devoting the site to home office use, and there was reason to believe that the building would continue to be used for the purpose for which it was constructed. As above pointed out, the statute permits life insurance companies to take deductions for obsolescence. The statutory grant of allowances for exhaustion, wear and tear, and obsolescence is plain. These deductions are provided for in the same sentence and property subject to depreciation deductions is also subject to deductions for obsolescence if the fact of obsolescence is established. In this case deductions for exhaustion, wear and tear have been claimed and allowed.

The evidence establishes to our satisfaction the fact of obsolescence. We have pointed out above that the building when acquired was an asset of value, that it was useful and was used as an income producer, and that petitioner intended to continue to use it as rental property and there was every reason to believe that it would so continue. On March 27, 1929, petitioner was apprised of the fact that the then tenant intended to quit the premises. It does not appear that until that time petitioner had any reason to believe there would be difficulty in securing a tenant. But when it set out to find a tenant it found that changing business conditions made impossible the rental of the building for any sum sufficient to pay expenses and taxes. " Obsolescence may arise from  *  *  *  shifting of business centers  *  *  *." United States Cartridge Co. v. United States, 284 U. S. 511; Burnet v. Niagara Falls Brewing Co., 282 U. S. 646. In this case, according to the evidence, the furniture warehousing business was moving away in 1929 from the vicinity of the Academy Street property. In our opinion petitioner is entitled to deductions for obsolescence, based on an allocated cost of $100,000, spread over the period from March 27, 1929, to July 7, 1930, after adjustment for depreciation allowed for the period January 5, 1928, to March 27, 1929.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

McMahon, dissenting in part: That " the furniture warehousing business was moving away in 1929 from the vicinity " of the property in question is not sufficient to establish that the business center in question had shifted, or, assuming (only for the purposes of discussion) that it had, that such shifting gave rise to obsolescence of the warehouse building in question. It was incumbent upon petitioner to establish both. It has established neither.

The business center in question remained substantially the same throughout the years before us. It is a matter of common knowledge

that warehouses are common to business centers. There were other warehouses in the vicinity. It was close to the retail shopping district. Warehouses need not be close by and frequently are not. There is no showing that the warehouse in question could not have been used for general warehouse purposes by the petitioner in the condition it was in when acquired by it. There rests upon a petitioner a heavy burden to establish obsolescence of a warehouse building such as the one in question.

Furthermore, petitioner did not acquire the warehouse in question for its warehouse purposes. It acquired it and other adjoining parcels of land acquired at the same time for the purpose of ultimately demolishing it to put in its place an addition to its office building, which was also on adjoining land. All were in the same business center. It did, in fact, thus demolish it. There is no showing that the earlier demolition of the warehouse was not to the advantage of the petitioner, economically or otherwise, from the standpoint of the primary purpose of its acquisition by petitioner, which was that of expanding its office space to meet the requirements of its increasing business. There is some indication that it was. Viewed from the standpoint of obsolescence, any impairment of the usefulness as a warehouse of the warehouse building in question which occurred was not beyond petitioner's control. It was brought about by it. An owner can not thus give rise to obsolescence of his own property.

Mere difficulty in finding a tenant is not sufficient to establish that a business center has shifted and thereby given rise to obsolescence. There is no finding that the rate of rent was reduced to attract other prospective tenants. Furthermore, reduction of value, rental or otherwise, can not give rise to obsolescence.

" Changing business conditions " of the character disclosed in this proceeding are not sufficient to give rise to obsolescence.

There is no basis for petitioner's conclusion, reached on March 27, 1929, that in 1930 " it would be impossible to lease the warehouse."

The majority opinion allows and by its precedent opens the door to deductions not provided for or contemplated by any provision of the applicable statutes or supported by precedent. On the other hand, it is contrary to such statutes and to principles enumerated in other precedents. See *First National Bank of Key West*, 26 B. T. A. 370, and *Joseph E. Swanson et al., Trustee*, 29 B. T. A. 1123.

*United States Cartridge Co.* v. *United States*, 284 U. S. 511, and *Burnet* v. *Niagara Falls Brewing Co.*, 282 U. S. 646, are clearly distinguishable from the instant proceeding and do not sustain the result reached by the majority upon the subject of obsolescence.

I, therefore, respectfully dissent from that portion of the opinion of the majority which allows deductions for obsolescence.