**PIEDMONT NATIONAL BANK OF SPARTANBURG, Plaintiff,**

v.

**UNITED STATES, Defendant.**

Civ. A. No. 2172.

United States District Court
W. D. South Carolina,
Spartanburg Division.

June 19, 1958.

Holcombe & Bomar (Nelville Holcombe), Spartanburg, S. C., for plaintiff.

Joseph E. Hines, U. S. Atty., Spartanburg, S. C., Robert A. Clay, Asst. U. S. Atty., Greenville, S. C., Paul K. Kirkpatrick, Jr., Department of Justice, Washington, D. C., for defendant.

WYCHE, Chief Judge.

This is an action, under Title 28 U.S. Code Sec. 1346(a)(1), to recover income and excess profits taxes in the total amount of $19,590.12, with interest, paid under a deficiency assessment for the year 1952.

The assessment was attributable solely to the Commissioner's disallowance of a deduction taken by plaintiff in its 1952 return for the voluntary demolition of a building during that year. A timely refund claim was made, and it was disallowed by the Commissioner prior to the institution of this action.

In compliance with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C., I find the facts specially and state my conclusions of law thereon in this cause, as follows:

Findings of Fact

Plaintiff is a National Bank, established in 1947, with its main office located

in the Montgomery Building, in Spartanburg, South Carolina. It took a lease on its banking quarters for an initial term of ten years, with an option to renew for ten more years.

Within two years after the Bank's organization, the directors began to consider the establishment of a branch bank. In doing so, they were influenced primarily by two considerations: first, the competition of two other local banks, one of which had already established a branch, and the other was preparing to do so; and, second, the expense to the bank of providing parking privileges for its customers in the parking lot adjacent to the building in which it was located.

Believing that the intersection of Pine and East Main Streets would eventually be the business center of the city (the extension of Pine Street across Main then being in the planning stage), the directors were seeking a location in that vicinity. The Bank had gone so far, in 1949, as to apply to the Comptroller for permission to establish a branch in that vicinity, but the application had been rejected. At that time, it did not own a site, negotiations for the acquisition of the one which it then had under consideration having failed.

In October, 1951, plaintiff purchased a large colonial residence on East Main Street, near Pine Street, for $56,480. It stood on a lot, measuring 141.2 ft. by 430 ft., across the street from Converse College.

It was the intention of each of the directors, at the time of purchase, to convert the residence into a branch bank as soon as permission to do so could be obtained from the Comptroller of the Currency; and, eventually, if the concentration of business in that area continued to develop as expected, to establish its main office on the site. This intention was adhered to until the architects who had been engaged to prepare plans for remodeling the house convinced the directors, months later, that the best interest of the bank would be served by erecting a new building, rather than converting the old residence.

The directors then explored the feasibility of moving the residence to the rear of the lot and renting it. This plan was abandoned when they discovered that the cost of moving the house would be about as much as the house, when relocated, would be worth. They decided, in May, 1952, to demolish the residence, and it was razed that year.

Within a day or two after delivery of the deed, the Bank had the house appraised, separately from the lot by a local realtor. He put a valuation of $25,000 on the house. Based upon that valuation, the Bank entered the house on its books at a cost of $25,000, and set up a depreciation schedule based on that cost, amounting to $83.33 a month, which was reported on its income tax returns and, incidentally, never questioned by the Treasury Department upon audit of the returns.

The fair market value of the house at that time was $25,000; and the fair market value of the lot was $31,480, being the balance of the total purchase price.

Upon demolition of the residence, its unrecovered cost, calculated as follows, was written off by the Bank and taken as a deduction in its 1952 tax return:

```
Allocation of total purchase price of house & lot to house....$25,000.00
Less depreciation for 7½ months @ $83.33 ..............    624.98
                                                        ───────────
                                                         24,375.02
Less salvage on house.................................    500.00
                                                        ───────────
                         Unrecovered cost...........$23,875.02
```

The deduction was disallowed, resulting in a deficiency, assessment of $19,590.12 income and excess profits tax. This action was instituted to recover the tax, with interest.

### Opinion and Conclusions of Law

█ Plaintiff's right to take the demolition loss for 1952 depends on whether plaintiff's directors, *at the time the Erwin property was purchased,* intended to convert the residence into a branch bank and use it as such.

The demolition of the residence here took place in 1952, and plaintiff claimed the tax deduction in its 1952 return. Plaintiff's right to the deduction, therefore, is governed by the law and regulations in effect at that time, namely, the Internal Revenue Code of 1939, and Treasury Regulations 111.

The applicable provisions of the Statute and Regulations are as follows: Internal Revenue Code of 1939, Sec. 23, 26 U.S.C. § 23: *"Deductions from gross income.* In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(f) *Losses by corporations.* In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

Treasury Regulations 111, Sec. 29.23 (a)-2: *"Voluntary removal of buildings.* —Loss due to the voluntary removal or demolition of old buildings, the scrapping of old machinery, equipment, etc., incident to renewals or replacements is deductible from gross income. When a taxpayer buys real estate upon which is located a building which he proceeds to raze with a view to erecting thereon another building, it will be considered that the taxpayer has sustained no deductible loss by reason of the demolition of the old building, and no deductible expense on account of the cost of such removal, the value of the real estate, exclusive of old improvements, being presumably equal to the purchase price of the land and building plus the cost of removing the useless building."

Thus, according to the Regulations, where "a taxpayer buys real estate upon which is located a building which he proceeds to raze with a view to erecting thereon another building," it will be considered that the taxpayer has sustained no deductible loss in the demolition of the old building, "the value of the real estate, exclusive of old improvements, being *presumably* equal to the purchase price of the land and building, plus the cost of removing the useless building (italics added.)"

It is very clear that the Regulations, in such a case, create a presumption that the whole of the purchase price was paid for the land alone. Stated another way, there is a presumption that the taxpayer, when he acquired the property, attached no value to the building as such.

This presumption can be, and is, completely rebutted by showing that the taxpayer, when he bought the property, had a definite use in mind for the building, but later abandoned the plan to use the building because of some reason not apparent when the property was purchased. One of the best-known text writers on the subject of income taxation states this rule in the following language: "Any presumption arising from the act of a taxpayer in proceeding to raze a building and erect a new one may be rebutted by showing that the purpose of the taxpayer in purchasing the building was with a view to its actual use for a fixed purpose, and that he did not thus use it because of latent defects which were not discovered at the time of purchase." Merten's Law of Federal Income Taxation, Vol. 5, Sec. 2823.

The intent of the taxpayer, at the time of purchase, is the test. If, at that time, the taxpayer intended to use the building, then a part of the purchase price was obviously paid for it. If, later, he finds that he cannot use the house, as he expected to do, and must tear it down, he parts with something he has paid money for. He has sustained a "loss", and is entitled to deduct it.

If, on the other hand he did not intend, at the time of purchase, to use the build-

ing, then obviously no part of the purchase price was paid for it. It has no value to him. When he later demolishes it, he has given up nothing of value. He has sustained no "loss", and consequently has nothing to deduct on his income tax return.

The Treasury Department itself, in an official interpretation of the law, has said that the purchaser's intent at the time of purchase is the controlling consideration.

In 1921, the following ruling had been given by the Treasury Department in O.D. 773 (C.B. 4,164–1921): "A taxpayer sustains no deductible loss in the demolition of 80 per cent. of his building for the purpose of reconstruction. The amount expended is an investment of capital and should be considered as a part of the cost of reconstruction."

In 1939, the Treasury Department officially admitted that its 1921 ruling had been wrong, and that the true test was the taxpayer's intent at the time of purchase. The 1921 ruling was expressly revoked. In I.T. 3311 (C.B. 1939–2, 190), after quoting Art. 23(e)–2 of Treasury Regulations 101 (which is identical with the regulation applicable in the instant case), the ruling went on to say: "The language of O.D. 773, supra., is too broad, since it ignores the distinction made in the case of taxpayers who purchase property with the intent at the time of purchase to demolish the building thereon and erect a new one, and those who purchase property without such intent. (See generally Providence Journal Co. v. Broderick, [1 Cir.] 104 F.2d 614, and cases cited therein.) Furthermore, it it not in accord with the first sentence of Art. 23(e)–2 of Regulations 101, supra.

"O.D. 773, supra., is, therefore revoked."

Once it is established that the taxpayer did not intend, at the time of purchase, to demolish the old structure but intended to use it, then he is entitled to a write-off if the structure is subsequently demolished.

The leading case on the subject is Union Bed & Spring Co. v. Commissioner, 7 Cir., 1930, 39 F.2d 383, 385, 8 A.F.T.R. 10, 516, the facts of which are remarkably similar to those in the instant case. There, plaintiff purchased a building for use in its manufacturing business. Prior to the purchase, plaintiff's officers, after inspecting the building and having an architect examine it, decided that it would require few and inexpensive repairs to make it well adapted to plaintiff's use. The cost of remodeling was estimated at $15,000. These facts were considered by plaintiff in arriving at the price it was willing to pay for the property. Prior to the purchase, plaintiff did not contemplate general reconstruction of the plant. Shortly after the purchase, further inspection of the building developed the necessity for extensive remodeling in order to provide sufficient ventilation and light. Plaintiff engaged an architect to draw plans for the remodeling of the old building. Plaintiff's officers, after talking with architects, were convinced that the original remodeling plans were wrong, and decided to undertake general reconstruction. After several consultations with architects, it was determined that the most economical method of reconstruction would be to tear down all four outside walls and rebuild them. This was done. The cost of the building plus the alterations, was about $68,000 more than the appraised value. Applying Art. 42 of Treasury Regulations 45, then in effect (the same as Sec. 29.23(3)–2 of Treasury Regulations 111, which is applicable to the facts of the instant case), the court held the loss deductible in the year of demolition. Its opinion is very clear. The court said: "We think the true test, in this and in similar cases, is the intention of the taxpayer. If he intends, at the time of purchase, to demolish and rebuild, then the cost of so doing must be considered as part of capital investment, which is consistent with the statute and the regulation. But if, at the time of purchase, he does not intend to repair, or intends to repair or change but partly, and after

the deal is made he decides to make changes and repairs other than those first contemplated, and in so doing he sustains a loss, he is brought within the terms of both the statute and the regulation, for the presumption raised by the regulation is overcome by the facts."

An enlightening decision of the Board of Tax Appeals (now the Tax Court) is Louis Pizitz Dry Goods Co. v. Commissioner, 22 B.T.A. 161, decided in 1931. There plaintiff purchased, in 1920 and 1921, two buildings which it had for several years occupied as lessee and in which it had conducted its business. Plaintiff remodeled and combined the buildings and continued to occupy them until 1924, when it demolished them in order to erect a new building. At the time of acquisition, plaintiff did not intend to demolish the buildings, but intended to conduct its business in them. The Board of Tax Appeals held that plaintiff was entitled to deduct the depreciated cost of the old buildings in the year of demolition. The opinion says, in part: "In our opinion, the question as to whether the deduction is allowable depends upon a question of fact, that is, as to whether the petitioner intended at the time of acquisition of the buildings to demolish them and rebuild (quoting Reg. 45, 62, 65 and 69, Art. 142 and Union Bed & Spring Co. v. Commissioner, supra). In this case, we think it is clear that the petitioner, at the time of the acquisition of the properties, had no intention of demolishing the buildings. * * * We also have the fact that the petitioner actually conducted its business in the buildings acquired for some years after acquisition, and from all the testimony we are convinced that the petitioner did not acquire the buildings with a view or intention of demolishing them, and we think that it must follow that as the buildings were demolished in 1925, the petitioner is entitled to a deduction from its income in that year of the depreciated cost of the buildings which amount is stipulated and set out in our findings of fact."

A similar result was reached by the Tax Court in Herbert Burwig (T.C.

Memo., Docket No. 37227), decided in 1953, plaintiff, a physician, purchased, in 1945, a residential lot on which was located a four-family apartment house, already rented. At the time of purchase, plaintiff had an indefinite idea that some time in the future he would build a home on a lot to include offices for himself and associated physicians. Plaintiff continued to rent the apartments for a little more than two years, but the tenants worried him with calls about plumbing defects, etc. The tentative plan to build on the lot at some future time contemplated a removal of the apartment house to the rear of the lot, which was a very deep one. In 1948, plaintiff sold the apartment house for $1 to a neighbor, who agreed to remove it within 30 days. The building was actually removed in 1949. In 1950, plaintiff constructed the combined residence and office building he had originally considered. He claimed a demolition loss, which the Commissioner denied. The Tax Court held, however, that plaintiff was entitled to take the demolition loss for 1949. In its opinion, the Court reaffirmed the rule which unquestionably is applicable to the instant case. It said: "Upon consideraton of the record, we must agree with the contention of Petitioner upon the fact that at the time of the acquisition of the property the removal of existing improvements was not contemplated and that the determination to secure the removal was due to conditions arising subsequent to such acquisition. Under such conditions the removal of the improvements not being a part of the plan for construction of a new building gives rise to a deductible loss in the year in which the building was razed or disposed of."

The same principle was applied by the District Court for the Southern District of Florida in Hotel McAllister v. United States, 1933, 3 F.Supp. 533, which, like the instant case, was a suit on a refund claim. There plaintiff purchased, in 1924, certain property adjoining its hotel in Miami. An apartment house located on the lot was producing some income. Real estate was not then very active, but

became so the next year, when the city began to grow rapidly. In 1925, plaintiff demolished the apartment house to make way for an addition to the hotel. The owners testified that the apartment house had been bought as an investment, and the brokers who handled the sale testified there had been no talk, at the time of purchase, about demolishing the structure. In holding that plaintiff was entitled to a demolition loss in the year of demolition, the court said: "The question in the case is whether the plaintiff purchased the property when they did for an investment, or with the intention of demolishing the building and erecting the addition to their hotel. If the former, plaintiff is entitled to recover. If the latter is true, it is not. * * *"

The same result was reached by the District Court in Ohio, where Union Bed & Spring Co. v. Commissioner of Internal Revenue, supra, was followed expressly. In that case, plaintiff purchased, in 1936, a city block on which a number of buildings were located. Before the end of the year, the owner demolished three of them and erected a new building on the site. The architect-engineer-contractor testified there was no intention to demolish at the time of purchase. In a suit on a refund claim, after the Commissioner had denied the demolition loss in 1936, the court held that the loss was deductible that year. The opinion is very clear and to the point. It reads in part: "It is apparent from a reading of this regulation Reg. 103, Sec. 19.23(e)–2 that if the plaintiff, at the time of purchase on Apr. 1, 1936, intended to demolish the 3 buildings enumerated, then the cost of demolition should be considered as part of the capital investment. If, however, at the time of purchase, the plaintiff did not intend to demolish, and some time after the date of the purchase, he decided to make changes and these changes involved the demolition of the buildings enumerated and he sustained a loss thereby, then his claim comes within the regulation. * *

"The contention between the parties revolves around one point only and that is the intent of the taxpayer at the time

that he purchased these properties on April 1, 1936." Wearley v. U. S. (1943), 32 A.F.T.R. 1761 (Memo. decision).

The only decision on the subject in this State is Dunham Realty Co. v. Bowers, 45 A.F.T.R. 1010. This was a jury case tried in 1953 before Judge Williams in the Eastern District.

In the suit to recover the taxes paid, after the Commissioner had denied the refund claim, the jury found for the taxpayer. There was no appeal by the Government. In Judge Williams' charge to the jury he very clearly stated the rule of law governing that case, and, unquestionably, the instant case also. After citing the applicable Treasury Regulations, he told the jury: "Intention at the time of acquisition of real estate upon which buildings, subsequently demolished, are located, governs as to whether loss and expense upon demolition must be deducted in the determination of income tax liability."

▉▉▉▉ Having determined that plaintiff was entitled to deduct the demolition loss in 1952, I must now decide how much that loss amounted to.

The rule is that the unrecovered cost is deductible. The statute so provides. The pertinent sections are the following: Internal Revenue Code of 1939, Sec. 23: "(i) *Basis for determining loss.* The basis for determining the amount of deduction for losses sustained, to be allowed under subsection (e) or (f) * * * shall be the adjusted basis provided in section 113(b) for determining the loss from the sale or other disposition of property."

Internal Revenue Code of 1939, Sec. 113, 26 U.S.C. § 113: "(a) *Basis (unadjusted) of property.* The basis of property shall be the cost of such property * * *".

"(b) *Adjusted basis.* The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided * *"

The difficulty here, of course, is that the cost of the residence was not segregated from the cost of the lot, either in the contract of purchase or in the deed. The Bank, however, did the logical and proper thing to establish the cost of the residence. It immediately had the house separately appraised by an independent realtor, and he appraised it at $25,000. The Bank thereupon considered the cost of the house to be $25,000, and set up the cost on its books at that figure. The law does not concern itself whether a purchaser paid too much or too little for an asset. Once the cost is determined, that figure is conclusive in subsequent tax transactions.

The Bank insured the house for $25,000. Neither the insurance agency which wrote the policy, nor the insurance company which reviewed it, considered this value excessive. In fact, the agent thought the house was underinsured at $25,000. It should be noted that this was a valued policy, and it constituted a contract that the insurer would pay, if the house were destroyed, the sum of $25,000 —not some lesser sum that might represent its actual value. Therefore, it was incumbent on the insurer not to insure the house for more than its actual worth. If the house had been destroyed by fire the day before its demolition was begun, the Bank would have been paid $25,000 for it.

In my opinion, this evidence sufficiently establishes the "cost", as that term is used in the applicable statute. It was $25,000.

If this concept of "cost" is not followed, then the only criterion that can be applied is an allocation, based on fair market value, of the total purchase price between the house and the lot. This was the method used in Mark L. Gerstle v. Commissioner, 1935, 33 B.T.A. 830, where the court said: "Where land and buildings are purchased for a lump sum, it is proper in order to find the basis of each, to allocate the total cost between the two kinds of property based on fair market value. See McGowin-Foshee Lumber Co. [v. Commissioner], 10 B.T.A. 961; Belle Isle Creamery Co. [v. Commissioner], 14 B.T.A. 737, cf. Prudential Ins. Co. of America [v. Commissioner], 33 B.T.A. 332."

Competent and experienced realtors who have done business in Spartanburg for many years, placed the fair market value of the house at $25,000 or more, in the year of purchase. The value of the house at that time may be determined in either of two ways: (a) by appraising the house, or (b) by appraising the lot and subtracting that figure from the total purchase of the property. The following table is helpful if the second method is used:

| If Lot was Worth | Value of Lot | Value of House | Total |
|---|---|---|---|
| $200 per front ft. | $28,240 | $28,240 | $56,480 |
| $225 " " " | $31,770 | $24,710 | $56,480 |
| $250 " " " | $35,300 | $21,180 | $56,480 |

It will be noted that if the value of the lot was $225 a front foot at the time of purchase, as the evidence showed, then the value of the house would be $24,710, or approximately the figure at which the Bank carried it on its books.

The price for which the house was eventually sold to the wrecker, $500, is not at all indicative of its value. That price was accepted after the directors had decided to demolish the house, and the contract was really a contract of demolition, not a contract of sale. As stated by the court in Herbert Burwig, supra, where a 4-family apartment building was sold to a wrecker for $1, the con-

**926**

tract to sell the building was merely the form taken to secure the razing and removal of the building, and was not really a sale.

Fair market value is usually said to be the price which a willing seller, under no compulsion to sell, would accept, and a willing purchaser, under no compulsion to buy, would pay. While there is nothing in the record to show what the sellers considered that they received for the house, apart from the lot, the record clearly establishes that the Bank—a willing purchaser under no compulsion to buy—considered that it paid $25,000 for the house.

The "cost" of the house, as defined above, was $25,000. Its fair market value, however derived, was the same. The Bank is entitled, therefore, to write off that amount, less the depreciation taken since purchase, and less the salvage value of the house. This net amount is $23,875.02.

It was stipulated by counsel that, if the court should find the facts in favor of the taxpayer, in whole or in part, the Internal Revenue Service would compute the amount for which the judgment should be entered in accordance with the Court's findings.

The Internal Revenue Service will then, within sixty days of this date, compute such amount. Plaintiff is given leave to apply to the Court, upon reasonable notice to the United States Attorney for this District, for a determination of the amount of the liability, if such computation shall not be furnished plaintiff's counsel within sixty days, or if plaintiff shall not be satisfied with the computation so made. Upon the final determination of the liability, entry of appropriate judgment in favor of plaintiff is directed accordingly.

It is so ordered.