# UNITED STATES *v.* ATLAS LIFE INSURANCE CO.

No. 489.  Argued March 31, 1965.—Decided May 17, 1965.

*Solicitor General Cox* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Oberdorfer, Wayne G. Barnett* and *Philip B. Heymann.*

*Norris Darrell* argued the cause for respondent. With him on the brief were *M. Bernard Aidinoff, Kendyl K. Monroe, Dickson M. Saunders* and *Thomas C. Thompson, Jr.*

*Daniel B. Goldberg* argued the cause for certain state and local governments, as *amici curiae,* urging affirmance. With him on the brief were *Grant Sawyer,* Governor of Nevada, *John J. O'Connell,* Attorney General of Wash-

ington, *Jack P. F. Gremillion,* Attorney General of Louisiana, *John J. Gunther, Charles S. Rhyne, Robert B. Mathias, C. D. Ward* and *Charles E. Norman.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The Life Insurance Company Income Tax Act of 1959,[1] which represents a comprehensive overhaul of the laws relating to the taxation of life insurance companies, places a tax upon taxable investment income and upon one-half the amount by which total gain from operations exceeds taxable investment income.[2] In arriving at taxable investment income and gain from operations, the 1959 Act, consistent with prior law in this regard, recognizes that

---

[1] 73 Stat. 112, Int. Rev. Code §§ 801–820.

[2] The Act provides a three-phase procedure for taxation of life insurance companies. Under phase one the tax base represents the life insurance company's share of income from interest, dividends, rents, royalties, and other investment sources less investment expenses and deduction of the company's share of exempt interest and other items. § 804. Under phase two the tax base represents 50% of the excess of total net income from all sources—"gain from operations"— over taxable investment income. This excess, referred to as underwriting gain, consists of mortality and loading savings, *i. e.,* savings resulting from fewer deaths per age group than were assumed in establishing premiums and reserves and any reduced expenses in servicing policies. § 809. It also may include a portion of investment income which is not taxed under phase one, since in calculating the amount of investment income to be allocated to policyholders under phase two, the reserves are multiplied by the company's required interest rate rather than the company's average or current earnings rate used in phase one. § 809 (a). This difference is minimized by other adjustments to the reserve under phase one whenever the applicable earnings rate exceeds or is less than the assumed rate. See note 4, *infra.* If there is underwriting loss under phase two, the entire loss is deducted from the taxable investment income as computed under phase one. If there is gain, half of this gain is added to the phase one tax base.

Phase three imposes a tax on certain underwriting gains made available to shareholders which are not taxed under phase two. § 815.

life insurance companies are required by law to maintain policyholder reserves to meet future claims, that they normally add to these reserves a large portion of their investment income and that these annual reserve increments should not be subjected to tax. The question in this case is whether the method by which Congress chose to deal with these annual reserve increments and to arrive at taxable investment income places an impermissible tax on the interest earned by life insurance companies from municipal bonds, within the meaning of the Act itself and the relevant cases in this Court.

## I.

The 1959 Act defines life insurance company reserves,[3] provides a rather intricate method for establishing the amount which for tax purposes is deemed to be added each year to these reserves [4] and in § 804 prescribes a division

---

[3] Int. Rev. Code § 801 (b) (1).

Life insurance reserves may be defined simply as that fund which, together with future premiums and interest will be sufficient to pay future claims. Under the statute such reserves are defined as amounts computed or estimated on the basis of recognized mortality tables and assumed rates of interest, set aside to mature or liquidate future claims arising from life, annuity, and noncancellable health and accident insurance policies, and required by law, with some exceptions not pertinent here.

[4] Int. Rev. Code § 805.

This amount is called the "policy and other contract liability requirements" and is determined by a series of calculations. The company's "adjusted life insurance reserves" are multiplied by the current earnings rate or the average earnings rate for the current and four preceding years, whichever is lower. "Adjusted life insurance reserves" are the life insurance reserves required by law adjusted for the difference between the assumed interest rate used by the company in computing such reserves and the actual earnings rate. The reserve is reduced by 10% for every 1% by which the applicable earnings rate exceeds the company's assumed interest rate. To the amount so calculated are added pension plan reserves multiplied by the current earnings rate and interest paid during the taxable year.

of the investment income of an insurance company into two parts, the policyholders' share and the company's share.[5] More specifically, the total amount to be added to the reserve—the policy and other contract liability requirements—is divided by the total investment yield[6] and the resulting percentage is used to allocate each item of investment income, including tax-exempt interest, partly to the policyholders and partly to the company. In this case, approximately 85% of each item of income was assigned to the policyholders and was, as the Act provides, excluded from the company's taxable income. The remainder of each item is considered to be the company's share of investment income. From the total amount allocated to the company the Act allows a deduction of the company's share of tax-exempt interest (and of other nontaxed items) to arrive at taxable investment income.[7] The taxable investment income for the pur-

---

[5] Int. Rev. Code § 804 (a) (1):

"Exclusion of policyholders' share of investment yield.—The policyholders' share of each and every item of investment yield (including tax-exempt interest, partially tax-exempt interest, and dividends received) of any life insurance company shall not be included in taxable investment income. For purposes of the preceding sentence, the policyholders' share of any item shall be that percentage obtained by dividing the policy and other contract liability requirements by the investment yield; except that if the policy and other contract liability requirements exceed the investment yield, then the policyholders' share of any item shall be 100 percent."

[6] Investment yield is gross investment income less specified deductions, including investment expenses, real estate expenses, depreciation, depletion and trade and business expenses, subject to certain exceptions and limitations. Int. Rev. Code §§ 804 (b), (c).

[7] Included in the investment yield which is divided between the policyholders and company, in addition to interest on state and municipal bonds, are partially nontaxed interest on federal bonds and intracorporate dividends. Section 804 (a)(2) permits deduction of the company's nontaxed share of these items along with interest on exempt bonds.

poses of arriving at the portion of gain from operations which is to be subjected to tax is arrived at by much the same process as above described.

Section 804 (a)(6), however, provides as follows:

"(6) *Exception.*—If it is established in any case that the application of the definition of taxable investment income contained in paragraph (2) results in the imposition of tax on—

"(A) any interest which under section 103 is excluded from gross income,

.        .        .        .        .

"adjustment shall be made to the extent necessary to prevent such imposition."

An identical exception is contained in § 809 (b)(4) providing for the calculation of gain from operation. Section 103 of the Code provides for the exclusion from gross income of the interest earned on state and municipal bonds.

According to the Commissioner, the company's income from investments includes only its pro rata share of tax-exempt interest and since this share is fully deductible by the company, the law imposes no tax at all on exempt interest. Atlas, however, claims otherwise: The company is entitled to deduct from total investment income both the full amount of the annual addition to reserves and the full amount of exempt interest received; by assigning part of exempt interest to the reserve account rather than assigning only taxable income, the Act necessarily places more taxable income in the company's share of investment return; the company thus pays more tax because it has received tax-exempt interest of which a portion must be allocated to the reserve account.

Claiming that it was entitled to the adjustments provided for in §§ 804 (a)(6) and 809 (b)(4), the company sued for a refund in the District Court. The complaint

also alleged the treatment accorded tax-exempt interest was contrary to the Constitution of the United States and to the principles set forth in *National Life Ins. Co.* v. *United States,* 277 U. S. 508, and *Missouri Ins. Co.* v. *Gehner,* 281 U. S. 313. The District Court rejected these claims, 216 F. Supp. 457 (D. C. N. D. Okla.), but the Court of Appeals reversed, 333 F. 2d 389 (C. A. 10th Cir.). That court considered the 1959 formula to impose a tax on tax-exempt interest within the meaning of the *National Life* and *Gehner* cases and hence by the terms of §§ 804 (a)(6) and 809 (b)(4) an adjustment was required. We granted certiorari to consider this important question relating to the taxation of life insurance companies. 379 U. S. 927.

We reverse, holding that in the circumstances of this case there is no statutory or constitutional barrier to the application of the formula provided in § 804 to arrive at the taxable investment income of Atlas and hence the exceptions provided in §§ 804 (a)(6) and 809 (b)(4) are not applicable.

## II.

Under the 1959 Act the undivided part of a life insurance company's assets represented by its reserves is considered as a fund held for the benefit of the policyholders. The required annual addition to reserve is drawn from the income earned from investments of the commingled assets. Each item of investment income, including tax-exempt interest, is divided into a policyholders' share and a company's share. The policyholders' share is added to the reserve, is excluded for tax purposes from the gross income of the company and is not taxed to either the company or the policyholders. The company's share of investment income is then reduced by its share of tax-exempt interest to arrive at taxable investment income. It is apparent from the face of the Act that this is the formula which Congress intended to be of general appli-

cation and that Congress did not consider the application of the formula in the usual case to lay a tax on exempt interest, or to have any such effect, so as to bring the exception clauses into operation. Otherwise the exception would become the rule and the general formula of little, if any, utility.

This view of the section is fully supported by its legislative history. As H. R. 4245 came to the Senate after passage by the House, it provided for deducting the annual addition to reserves, but to prevent a "double deduction" reduced the deduction by a portion of tax-exempt interest.[8] This treatment of tax-exempt interest was one of many subjects of comment in the extensive hearings which followed before the Senate Committee on Finance. It was repeatedly and strongly argued by many that life insurance companies were entitled to deduct in full both the annual addition to reserves and the entire amount of tax-exempt interest, that the provisions of H. R. 4245 with regard to tax-exempt interest discriminated against the insurance companies, that the section was constitutionally invalid under the *National Life* and *Gehner* cases and that the formula would have adverse consequences on the municipal bond market.[9] Other witnesses, however, including those representing the Treasury Department, supported the bill and considered it to accord proper and constitutionally permissible treatment to municipal bond interest.[10] It is very doubtful that there remained at the conclusion of the hearings any unexplored facts or legal arguments concerning this aspect of the bill.

---

[8] H. R. Rep. No. 34, 86th Cong., 1st Sess., 28–29, 31.

[9] See Hearings on H. R. 4245 before the Senate Committee on Finance, 86th Cong., 1st Sess., 45–46, 48, 121, 187, 248–266, 304–318, 404–409, 516–518, 613–614, 694–699, 700–702.

[10] *Id.,* at 19–60, 646–654.

The Senate Committee, with the hearings behind it, reported out a bill with amendments which, among other things, took a decidedly different approach to the ascertainment of the annual addition to reserves and to the handling of tax-exempt interest. This approach was essentially that which is contained in the statute as described above.[11]

As time and again stated in the Committee Report and by those who presented the bill on the floor of the Senate, the purpose of the formula provided by the Senate was to avoid taxing exempt interest.[12] Senator Byrd, the

[11] S. Rep. No. 291, 86th Cong., 1st Sess., 6.

[12] As stated in the Senate Report on H. R. 4245, the Committee on Finance was of the opinion that the formula provided in § 804 did not impose a tax on tax-exempt interest—"[t]he purpose of your committee in providing this treatment is to exempt a life insurance company from tax on any tax-exempt interest . . . ." S. Rep. No. 291, 86th Cong., 1st Sess., 17. See also pp. 6, 18, 46. Senator Byrd in explaining the bill to the Senate presented a letter from the Department of the Treasury which said that the formula provided by the bill did not place a tax on exempt interest, that the additional language of § 804 (a)(6) establishing an exception was not at all necessary but that just to make sure it had been provided that in any case the formula resulted in taxing interest excludable under § 103, an adjustment would be made. 105 Cong. Rec. 8402. The more detailed explanation of the bill by Senator Byrd was to the same effect. 105 Cong. Rec. 8404. Senator Curtis, a member of the Senate Committee, delivered a comprehensive speech in support of the bill in the course of which he said that his earlier concern about inadvertently taxing exempt interest had been fully met by the bill. After reviewing the formula, with examples illustrating its operation and without mentioning the exception of § 804 (a)(6) he remarked that "no tax-exempt income or credits of life insurance companies will be included in the tax base of such companies, under this bill. This should allay any fear that any constitutional provision is transgressed." 105 Cong. Rec. 8429. The bill passed in the Senate, 105 Cong. Rec. 8438, and the Conference Report, which

Committee chairman, stated that "[i]n providing the formula I have described to the Senate it was the intention of the committee not to impose any tax on tax-exempt interest." 105 Cong. Rec. 8401. It is extremely difficult to read the hearings, the reports, and the debates without concluding that in the opinion of Congress the formula it provided, without adjustment under § 804 (a)(6) or § 809 (b)(4), did not impose a tax on exempt interest in either the statutory or constitutional sense.

None of the materials called to our attention, however, explain why or for what purpose §§ 804 (a)(6) and 809 (b)(4) were added to the Act, save for mere recitations in the reports and the debates that an adjustment would be required in any case where tax-exempt interest was shown to be subjected to tax.[13] It may be that Congress thought that peculiar facts and circumstances in particular cases would require different treatment than the general formula would provide. If this was the case, no examples or illustrations of these aberrational situations were referred to or explained. And if this was to be the sole function of §§ 804 (a)(6) and 809 (b)(4) the Commissioner is surely entitled to a judgment, for there is

may be said to have adopted the Senate approach to the problem involved in this case, H. R. Rep. No. 520, 86th Cong., 1st Sess., 4, 14–15, 105 Cong. Rec. 10412, was adopted by both Houses.

[13] See S. Rep. No. 291, 86th Cong., 1st Sess., 17, 24; H. R. Rep. No. 520, 86th Cong., 1st Sess., 15; 105 Cong. Rec. 8401, 10400, 10412–10414. Representative Mills, Chairman of the House Ways and Means Committee, stated:

"As agreed to by the conferees, the final version of H. R. 4245 extensively rewrites the provisions of the House bill dealing with tax-exempt interest and dividends received, including the addition of a proviso to the effect that if in any particular case the formula under the bill does not provide the proper treatment of these items, appropriate adjustment will be made. It is my belief that the appropriate deduction was allowed by the House bill and that these provisions of the final bill, which closely follow the Senate amendment, make no change of substance." 105 Cong. Rec. 10412.

nothing in this record indicating that this case is anything but the typical one to which Congress intended to apply the general formula.

Atlas, however, in effect views §§ 804 (a)(6) and 809 (b)(4) as built-in safety valves to be triggered and become fully operational by a final determination in a lawsuit, such as this one, that the new formula, contrary to the judgment of Congress, does indeed place a tax on exempt interest within the meaning of the relevant cases heretofore decided by this Court. This is not an unreasonable view of the purposes which Congress may have had in writing the exception provisions into the Act, but we cannot agree with Atlas or the Court of Appeals that *National Life,* 277 U. S. 508, and *Gehner,* 281 U. S. 313, provide the necessary triggering to bring these clauses into play.

## III.

In *National Life,* the Court struck down a provision of the federal income tax law which permitted insurance companies to exclude municipal bond interest from their gross income and at the same time reduce the reserve deduction otherwise available to the company by the full amount of the exempt interest which was excluded from gross income, the result being that the company paid as much tax as it would have paid had the same total income been entirely from taxable sources. Under that provision, a company shifting its investments from taxable to nontaxable securities would have lowered neither its taxable income nor its total tax. As compared with the company deriving its income only from taxable sources, the enterprise with the same total amount of investment income derived partly from exempt and partly from taxable sources would pay more tax per dollar of taxable gross income, *i. e.,* taxable income before deduction for the reserve. Unable to perceive any purpose in reducing one deduction by the full amount of another, save for an

intent to impose a tax on exempt receipts, the Court ruled that "[o]ne may not be subjected to greater burdens upon his taxable property solely because he owns some that is free." 277 U. S., at 519.

It is obvious that this is not the case under the 1959 Act. Here, a company receiving income from both exempt and nonexempt securities pays not the same, but less, tax than the company with an identical amount of gross income derived from only taxable sources. As the taxpayer displaces taxable income with exempt income, the size of the tax base, and the tax, are reduced. The tax burden per taxable dollar of taxable gross income does not increase, but remains the same.[14]

But Atlas urges that the rule of *National Life*, when read in conjunction with *Missouri Ins. Co.* v. *Gehner*, 281 U. S. 313, means that a tax is imposed on tax-exempt interest whenever the liability of the taxpayer receiving such interest is greater than it would have been if the tax-exempt interest had not been received. In the *Gehner* case a state ad valorem property tax was imposed on the net personal property of an insurance company. Exempt government bonds were excluded from the tax base but only 84%—the ratio of taxable assets to total assets—of

---

[14] Where income from taxable sources is displaced by the same amount of income from exempt bonds, the total investment yield and the reserve exclusion remain the same. Thus the proportion of each item of income allocated to the policyholders' share and the company's share also remains the same. Since the amount of exempt income allocated to the company is larger and that share is fully deductible, the tax base is correspondingly smaller.

The result is a decrease in the tax commensurate with the extent to which the company's taxable income is taxed. With a fully taxable investment yield of $1,000,000 and a policyholders' share of $800,000, 20% of the investment yield would be included in gain from operations. Gain from operations would be reduced by 20% of any part of the investment yield that was shifted from taxable income to tax-exempt income.

the legally required reserves was allowed as a deduction. The Court considered *National Life* to hold that "a State may not subject one to a greater burden upon his taxable property merely because he owns tax-exempt government securities." 281 U. S., at 321. This paraphrase of the *National Life* holding was correct and states the principle for which both of these cases have been cited.[15] But it is obvious that the tax in *Gehner* did not infringe this rule. Reducing the reserve deduction by the ratio of taxable assets to total assets did not result in an increased tax burden on taxable property. The Court, nevertheless, invalidated the tax because "the ownership of United States bonds is made the basis of denying the full exemption which is accorded to those who own no such bonds." 281 U. S., at 321–322. The company was apparently to have the full benefit of both the exclusion of the government bonds and the deduction for the full amount of policyholder reserves. Otherwise, the law would not disregard the ownership of the bonds in exacting the tax. The *Gehner* case does, therefore, condemn more than an increase in the tax rate on taxable dollars for those owning exempt securities.

This extension of *National Life* was soon repudiated.[16] In *Denman* v. *Slayton,* 282 U. S. 514, decided but one Term after *Gehner,* the Court unanimously upheld § 214 (a)(2) of the Revenue Act of 1921, which permitted the deduction of interest generally except interest on

---

[15] See, *e. g., Denman* v. *Slayton,* 282 U. S. 514, 519; *Helvering* v. *Independent Life Ins. Co.,* 292 U. S. 371, 381; *Schuylkill Trust Co.* v. *Pennsylvania,* 296 U. S. 113, 119; *New Jersey Realty Title Ins. Co.* v. *Division of Tax Appeals,* 338 U. S. 665, 674–675, 677.

[16] This is true insofar as *Gehner* rested on a doctrine of implied constitutional immunity. The tax there was a state ad valorem property tax said to be on federal bonds and then, as now, a federal statute insulated such bonds from state taxation. See 73 Stat. 622, § 105 (a), 31 U. S. C. § 742 (1958 ed., Supp. V).

indebtedness incurred or continued to purchase or carry tax-exempt securities, as applied to a dealer in securities whose disallowed interest incurred to carry exempt bonds exceeded the return from the bonds. Although the parties argued both *Gehner* and *National Life,* the Court did not mention *Gehner* and said *National Life* was radically different, since the dealer "was not in effect required to pay more upon his taxable receipts than was demanded of others who enjoyed like incomes solely because he was the recipient of interest from tax-free securities." 282 U. S., at 519. But he was, like the taxpayer in *Gehner,* required to pay a greater tax than would be the case if the exempt securities were ignored entirely; absent ownership of the exempt bonds, the disallowed interest would have been deductible from taxable income. Ownership of exempt bonds was indeed the "basis of denying the full exemption which is accorded to those who own no such bonds." *Gehner,* 281 U. S., at 321–322. Thus the Court not only refused to follow the implications of *Gehner* in the context of the federal income tax, but also sustained the propriety of disallowing an expense attributable to the production of nontaxable income. Such disallowance was not to impose an impermissible burden on the exempt receipts. "While guaranteed exemptions must be strictly observed, this obligation is not inconsistent with reasonable classification designed to subject all to the payment of their just share of a burden fairly imposed." 282 U. S., at 519.

The Court followed *Denman,* and again distinguished *National Life,* without mentioning *Gehner,* in *Helvering* v. *Independent Life Ins. Co.,* 292 U. S. 371, where the Revenue Acts of 1921 and 1924 permitted deduction of depreciation and expenses of buildings owned by life insurance companies only if the company included in its gross income the rental value of space it occupied. The Court assumed that the rental value was not income,

and could not constitutionally be taxed, but upheld the measure as a valid apportionment of expenses attributable to the space occupied by the company and the space for which rents are received. *Denman* v. *Slayton* was said to make clear the distinction between a permissible exclusion from deductions of the amount attributable to exempt income and a tax on exempt property. This apportionment fell within the former and did not lay a tax on the rental value of the owner's use of his building.

## IV.

We affirm the principle announced in *Denman* and *Independent Life* that the tax laws may require tax-exempt income to pay its way. In our view, Congress has done no more in the 1959 Act than to particularize this principle in connection with taxing the income of life insurance companies.

An insurance company obtains most of its funds from premiums paid to it by policyholders in exchange for the company's promise to pay future death claims and other benefits. The company is also obligated to maintain reserves, which, if they are to be adequate to pay future claims, must grow at a sufficient rate each year. The receipt of premiums necessarily entails the creation of reserves and additions to reserves from investment income. Thus the insurance company is not only permitted to invest, but it *must* invest; and it *must* return to the reserve a large portion of its investment income. As no insurance company would deny, there is sufficient economic and legal substance to the company's obligation to return a large portion of investment income to policyholder reserves to warrant or require the exclusion of investment income so employed from the taxable income of the company. And we think the policyholders' claim against investment income is sufficiently direct and immediate to justify the Congress in treating a major

part of investment income not as income to the company but as income to the policyholders. Whether viewed as income to the policyholders, or, as Atlas would have it, as the principal cost of carrying on the business which produces the company's net investment income,[17] a large

---

[17] The statement of Stanford Rothschild, a representative of one of the life insurance companies objecting to the proposed pro rata disallowance of the reserve deduction in H. R. 4245, before the Senate Committee provides a clear exposition of this view:

"Life insurance companies have two kinds of gross investment income: On the one hand, there is the income which has to be set aside to cover actual expenses and the liabilities to the policyholders. On the other hand, there is free investment income, not needed for the operation of the company; this excess income is fully taxable.

"All tax laws dealing with life insurance companies have allowed deductions from income for required interest. Even the excise tax formulas have provided for such deductions. The basic reason for this deduction is that required interest cannot be construed to be true income or profit, just as the cost of goods sold by a merchant must be eliminated from his gross income." Hearings on H. R. 4245 before the Senate Committee on Finance, 86th Cong., 1st Sess., 696–697.

Under this view of the reserve increment, we think this case is strikingly similar to *Denman* v. *Slayton*. On this theory the reserve increment is an accrued expense in the nature of interest on the funds obtained from policyholders for investment, and the denial of that part of the deduction which exempt income bears to total investment receipts represents disallowance of an expense attributable to the production of exempt income, which is precisely what *Denman* permits. It is argued, however, that the rule of *Denman* disallowing deduction of exempt interest is limited to "but for" situations: Interest incurred on loans used to purchase exempt bonds may be disallowed only where there would have been no interest charge except for the purchase of exempt securities. It is by no means clear that this is not the case here, for there is a relationship between the amount of the reserve increment, representing interest on funds obtained from policyholders, and the amount of a company's investments, exempt or otherwise, unless it be assumed that a company does not sell policies and obtain funds for the purpose of investment. However this may be, we do not read *Denman* so narrowly. We think interest can be

portion of total investment income is credited to the reserve and eliminated from taxable investment income.

Under the 1959 Act this portion is arrived at by subjecting each dollar of investment income, whatever its source, to a pro rata share of the obligation owed by the company to the policyholders, from whom the invested funds are chiefly obtained. In our view, there is nothing inherently arbitrary or irrational in such a formula for setting aside that share of investment income which must be committed to the reserves. Undoubtedly policyholders have not contracted to have assigned to them either taxable or exempt dollars. Their claim can be fully satisfied with either, but it runs against all investment income, whatever its source. We see no sound reason, legal or economic, for distinguishing between the taxable and nontaxable dollar or for saying that the reserve must be satisfied by resort to taxable income alone. Interest on municipal bonds may be exempt from tax, but this does not carry with it exemption from the company's obligation to add a large portion of investment income to policyholder reserve.[18]

said to be incurred or continued as a cost of producing exempt income whenever a taxpayer borrows for the purpose of making investments and in fact invests funds in exempt securities.

There was no problem of allocating interest in *Denman,* but surely no one doubts that the case would not have been any different if the dealer there borrowed and purchased taxable securities with half the loan and used the other half to purchase exempt securities.

[18] There is nothing to the argument that since the reserve obligation remains the same whether there is exempt income or not, no part of the obligation is fairly chargeable to exempt income. It could as well be argued that because the reserve requirement is the same whether there is taxable income or not, none of the reserve increment may be obtained by pre-empting taxable income. The fact is that the annual addition to reserve must be made up from investment income, whatever its source, and the company owes to its policyholders a share of the tax-exempt dollar fully as much and in the same sense that it owes a part of the taxable dollar.

Tax exemption cannot change the substance of this undertaking. And the statutory formula allocating so much of each dollar of investment income as the reserve increment bears to total investment income is quite clearly consistent with it. For the formula treats taxable and exempt income in the same way, deeming that both are saddled with an equal share of the company's obligation to policyholders. We think that Congress can treat the receipts from investment of a pool of fungible assets in this manner and that the taxpayer's desired allocation of these receipts is not constitutionally required.

It is said, however, that a company investing "idle" assets in municipal bonds and thereby adding exempt interest to its income will pay more tax, and at a higher rate per dollar of taxable income, than if it had not made the additional investment at all. Likewise, it is claimed, two companies having the same amount of investment in taxable securities and the same amount of commitments to policyholders, but one having some municipal securities in addition, will have a different tax bill, the latter paying more tax and at a higher rate because of the ownership of the bonds. But insurance companies accumulate funds to invest and they must, and do, invest. Their choice is not between investing and not investing at all but between investing in one kind of securities or another. Under the 1959 formula investing in exempt securities results in a lower total tax than investing in taxable securities and the tax rate per taxable dollar does not increase. It is likewise unrealistic to compare the tax burdens of two companies, each with the same amount of taxable income but one with exempt income in addition, and to assume in the comparison that each has the same obligation to augment reserves. The likelihood is that if the one company has additional exempt income which the other does not have, it also has more assets, larger reserves and a greater reserve claim against invest-

ment income, which will reduce taxable income and substantially offset the alleged disparity in tax burden between the two companies.

Undoubtedly the 1959 Act does not wholly ignore the receipt of tax-exempt interest in arriving at taxable investment income. The formula does pre-empt a share of tax-exempt interest for policyholders and the company will pay more than it would if it had the full benefit of the exclusion for reserve additions and at the same time could reduce taxable income by the full amount of exempt interest. But this result necessarily follows from the application of the principle of charging exempt income with a fair share of the burdens properly allocable to it. In the last analysis Atlas' insistence on both the full reserve and exempt-income exclusions is tantamount to saying that those who purchase exempt securities instead of taxable ones are constitutionally entitled to reduce their tax liability and to pay less tax per taxable dollar than those owning no such securities. The doctrine of intergovernmental immunity does not require such a benefit to be conferred on the ownership of municipal bonds. Congress was entitled to allocate investment income to policyholders as it did. The formula "was designed to subject all to the payment of their just share of a burden fairly imposed," *Denman, supra,* at 519, and as applied to this case did not impose a tax on income excludable under § 103 of the Internal Revenue Code.

*Reversed.*