**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

v.

**The UNITED STATES.**

No. 607–77.

United States Claims Court.

June 8, 1984.

Francis M. Gregory, Jr., Washington, D.C., for plaintiff; James V. Heffernan, Gordon O. Pehrson, Jr., Michael A. Bell, Washington, D.C., Stephen P. Horvat, Jr., and Margaret Sperry, Springfield, Mass., of counsel.

Michael J. Dennis, Theodore D. Peyser, Jr., Donald Olson, Robert C. Markham, J. Walker Johnson, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

MARGOLIS, Judge.

Plaintiff, Massachusetts Mutual Life Insurance Company, a life insurance company taxable under section 802 of the Internal Revenue Code,[1] seeks to recover alleged overpayments of federal income taxes and assessed interest for the taxable years 1960–61 and 1963–66 in the net amount of about 1.2 million dollars. In

---

**1.** All statutory references are to the Internal Revenue Code of 1954, as amended, 26 U.S.C., unless otherwise indicated.

each of these years, certain loans which had been made by plaintiff in the ordinary course of its investment operations proved to be uncollectible in whole or in part. The issue presented is whether, as plaintiff contends, plaintiff can deduct these bad debts either as "investment expenses" under section 804(c)(1) or as non-insurance "trade or business deductions" under section 804(c)(5), or whether, as defendant contends, these bad debts are deductible only under the "other deductions" provision of section 809(d)(11). The parties have filed cross motions for summary judgment, submitted with oral argument. This Court finds for the defendant.

## FACTS

Plaintiff is and has been for all years pertinent to this case a life insurance company within the meaning of section 801. As such, plaintiff derives its total income from two main sources: premiums and investments. The funds used in investments largely represent the excess of premiums paid over current expenses. Plaintiff's investment activities are substantial, and the income derived therefrom serves two important purposes: first, to pay policy claims; second, to reduce the amount of premiums that plaintiff must charge its policyholders which in turn enables plaintiff to more effectively compete with other life insurance companies.

During the years at issue, the plaintiff's investment activities were divided between the Securities Division, which was responsible for stock and bond investments, and the Real Estate Investment Division, which was responsible for the financing of real estate. The latter division had made the loans at issue here. The particular loans, the amounts determined to be uncollectible, and the year in which the loans were determined to be uncollectible are as follows:

| Year | Debtor | Amount |
| --- | --- | --- |
| 1960 | Texas Consolidated Oils | $1,542,405.23 |
| 1960 | 6301 South Halsted Street Corp. | $ 147,374.46 |
| 1960 | American National Bank and Trust Co., Trustee | $ 79,120.69 |
| 1961 | Security Land Co. | $ 115,697.18 |
| 1963 | Texas Consolidated Oils | $ 7,180.87 |
| 1963 | Nineteenth Realty, Inc. | $ 73,408.44 |
| 1964 | Robinson's of Springfield, Inc. | $ 162,787.97 |
| 1965 | Riley Black Company, Inc. | $ 104,854.06 |
| 1966 | June L. Johnson | $ 59,556.29 |
| 1966 | S and W Company, Inc./McPherson Operators, Inc. | $ 96,895.86 |
| 1966 | Hack Realty Co., Inc./Max Lee Realty Corp. | $ 40,797.46 |

The loans were made in the ordinary course of the plaintiff's investment operations. These loans will be discussed to the extent necessary to resolve this dispute.

### Texas Consolidated Oils

This loan originated on April 24, 1950 between the plaintiff and Texas Consolidated Oils (the debtor). The original loan amount was $2,500,000. The plaintiff's loan was part of a $15,100,000 total loan participation arrangement between the debtor and three creditors: Reconstruction Finance Corporation, which lent $11,100,-000, the John Hancock Mutual Life Insurance Company, which lent $1,500,000, and the plaintiff. The debtor signed a separate promissory note with each creditor; all three notes, however, were secured by a single deed of trust which covered substantially all of the debtor's oil and gas properties. Under the terms of the deed of trust, the greater of 50 percent of the proceeds from the monthly oil and gas production runs or a stated minimum amount was to be applied to the payment of principal and interest on all three notes. Under the terms of each note, a default as to one was a default as to all.

At April 1, 1960, the debtor was unable to meet its obligations. In lieu of foreclo-

sure, the creditors agreed to a sale of the debtor's property which had secured the loans. The amount in default of the note held by plaintiff and plaintiff's subsequent recovery from the sale of the pledged assets are as follows:

| | |
|---|---|
| Balance due at default less: | $1,976,464.41 |
| (1) the proceeds received from the sale of the debtor's assets | (408,633.18) |
| (2) estimated maximum future recovery | (25,426.00) |
| Amount determined to be worthless in 1960 | $1,542,405.23 |

Subsequently, in 1961 and 1963 plaintiff recovered a total of $18,245.13 of the above-referenced $25,426.00 estimated maximum future recovery. In December 1963 plaintiff determined that no additional recovery would be forthcoming, and therefore charged off $7,180.87 as a worthless debt in that year.

### The Other Loans

The facts pertinent to the other loans need not be recounted here at length.[2] All of the other loans involved the plaintiff as the only creditor; there were no other participants. Each of the loans was secured by a mortgage on either real property or a leasehold interest. In each case, the amount charged off by plaintiff represented the difference between the amount in default less the recovery, if any, from either the voluntary sale or the foreclosure of the collateral security.

### DISCUSSION

▆▆▆ It is well established that deductions are not matters of right but of legislative grace. *Commissioner v. National Alfalfa Dehydrating and Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974); *New Colonial Ice v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788,

790, 78 L.Ed. 1348 (1934). The burden is on the taxpayer to prove that it is entitled to the income reduction. *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1943). Provisions for the deduction of income are to be strictly construed, and the statutory language must clearly provide for their allowance. *National Alfalfa*, 417 U.S. at 149, 94 S.Ct. at 2137; *New Colonial Ice*, 292 U.S. at 440, 54 S.Ct. at 790. Congress has chosen to treat life insurance companies under special statutory provisions. An understanding of these provisions is necessary to determine if the plaintiff has met its burden of proving that it is entitled to the deduction.

### The Life Insurance Company Income Tax Act of 1959

The issues before this Court arise under the provisions of the Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86-69, 73 Stat. 112 (26 U.S.C. §§ 801-820) (the 1959 Act). The 1959 Act imposes a tax on "life insurance company taxable income," which is determined on the basis of the so-called three phase computation. 26 U.S.C. § 802(a) and (b). Specifically, "life insurance company taxable income" represents the sum of the amounts computed in each of the three phases listed in section 802(b).

Phase I consists of taxable investment income (as defined in section 804) or, if smaller, the gain from operations (as defined in section 809). *Id.* at § 802(b)(1). If the gain from operations exceeds the taxable investment income, then the phase II amount is equal to 50 percent of such excess;[3] if the gain from operations is less than the taxable investment income, then there is no phase II amount. *Id.* at § 802(b)(2). *See American National Insurance Co. v. United States*, 690 F.2d

---

**2.** Defendant challenges the factual predicates establishing the amount or timing of the deductions on the following loans: Texas Consolidated Oils, Security Land Company, Nineteenth Realty, Inc., and Riley Black Company, Inc. For purposes of this motion, the amounts and dates of plaintiff's losses are accepted as true.

**3.** The difference between taxable investment income and gain from operations was thought by Congress to be roughly equivalent to underwriting gain. *American National Insurance Co. v. United States*, 690 F.2d 878, 881 (Ct.Cl.1982).

878, 881 (Ct.Cl.1982). Under phase III, the deferred 50 percent of the excess is taxed when distributed to stockholders. 26 U.S.C. § 802(b)(3); *American National,* 690 F.2d at 881. Phase III is not relevant to the issues in this case and will not be discussed further.

The computation of taxable investment income (phase I) is set forth in sections 804 through 806. A primary element in this computation is "investment yield," defined as gross investment income less five specified deductions. *Id.* at § 804(c). Gross investment income, as defined in section 804(b) is the sum of

(1) Interest, etc.—The gross amount of income from—
(A) interest, dividends, rents, and royalties,
(B) the entering into of any lease, mortgage, or other instrument or agreement from which the life insurance company derives interest, rents, or royalties, and
(C) the alteration or termination of any instrument or agreement described in subparagraph (B).
(2) Short-term capital gain....

* * * * * *

(3) Trade or business income.—The gross income from any trade or business (other than an insurance business) carried on by the life insurance company, or by a partnership of which the life insurance company is a partner. In computing gross income under this paragraph, there shall be excluded any item described in paragraph (1).

Two of the specified deductions in section 804(c), and the two which plaintiff claims are available to it, are:

(1) Investment expenses.—Investment expenses for the taxable year....

* * * * * *

(5) Trade or business deductions.—The deductions allowed by this subtitle (without regard to this part) which are

attributable to any trade or business (other than an insurance business) carried on by the life insurance company, or by a partnership of which the life insurance company is a partner.... [4]

Through a complicated formula set forth in sections 804 and 805, investment yield is allocated between the company's share and the policyholders' share. The latter share is excluded from taxable investment income. *Id.* at § 804(a). This exclusion reflects the fact that a significant portion of investment income is set aside to meet reserve requirements. *See United States v. Atlas Life Insurance Co.,* 381 U.S. 233, 235–36, 85 S.Ct. 1379, 1380–81, 14 L.Ed.2d 358 (1965).

The gain from operations, as set forth in sections 809 through 812, represents in substance the company's total net income from all sources. *Id.* at 235 n. 2, 85 S.Ct. at 1381 n. 2. The determination of this amount begins with the company's share of investment yield, its gross receipts from its insurance operations, and since 1961, its net capital gains. 26 U.S.C. § 809(b) and (c); *American National,* 690 F.2d at 881. From this gross amount a number of deductions are allowed. 26 U.S.C. § 809(d). One of the deductions, and the one which defendant claims is the only deduction available to plaintiff, is contained in section 809(d)(11), which allows a deduction for:

(11) Other deductions.—Subject to the modifications provided by subsection (e), all other deductions allowed under this subtitle for purposes of computing taxable income to the extent not allowed as deductions in computing investment yield.

Section 809(e) provides in relevant part:

(e) Modifications.—The modifications referred to in subsection (d)(11) are as follows:

* * * * * *

---

4. The other three deductions allowed are for real estate expenses, depreciation, and deple-tion. 26 U.S.C. § 804(c)(2)–(4).

(2) Bad debts.—Section 166(c) (relating to reserve for bad debts) shall not apply.

Plaintiff will realize a substantial tax benefit if allowed to deduct the bad debts either as investment expenses or as other trade or business deductions under section 804(c), rather than if required to deduct the bad debts as "other deductions" under section 809(d)(11).

### Investment Expenses

The term "investment expenses" is not defined by the statute. The Treasury regulations, however, define investment expenses as "expenses of the taxable year which are fairly chargeable against gross investment income." Treas.Reg. § 1.804–4(b)(1)(i). Additionally, such expenses, like all section 804(c) deductions, must "relate" to investment income and may not be "disallowed by any other provision of Subtitle A of the Code." Treas.Reg. § 1.804–4(a). Furthermore, investment expenses must be "ordinary and necessary expenses within the meaning of section 162." [5] *Id.* Examples of investment expenses listed in the regulation include salaries and expenses paid exclusively for work in looking after investments, and amounts expended for printing, stationery, postage and stenographic work incident to the collection of interest. Treas.Reg. 1.804–4(b)(1)(i). The question of the deductibility to life insurance companies of bad debts had been litigated prior to the enactment of the 1959 Act. A review of these cases and the history of the investment expense deduction is required.

Prior to 1921, life insurance companies were taxed under the same taxation provisions as ordinary corporations,[6] and thus were allowed the same deductions.[7] Among these deductions was a bad debt or ordinary loss deduction. Life insurance companies, however, were required to recognize as gross income both income from investments and premiums paid by policyholders. 8 J. Mertens, *Law of Federal Income Taxation*, § 44.01 (Rev.1978); *see generally, Alinco Life Insurance Co. v. United States*, 373 F.2d 336, 178 Ct.Cl. 813 (1967). The inclusion of premium receipts in gross income was a major fault of the taxing scheme because of the timing differences between when premiums were paid and when claims arose. Fundamentally, premium receipts "were not true income but were analogous to permanent capital investment." *Alinco Life Insurance*, 373 F.2d at 346, *citing Helvering v. Oregon Mutual Life Insurance Co.*, 311 U.S. 267, 269, 61 S.Ct. 207, 208, 85 L.Ed. 180 (1940).

Beginning with 1921, the taxation of life insurance companies was placed under distinct statutory provisions. Under the Revenue Act of 1921, ch. 136, 42 Stat. 227, § 242, life insurance companies were taxed only on their investment income and a deduction was allowed for investment income set aside to pay policy claims. Premium receipts were not included in gross income. As explained in both the House Ways and Means Committee Report and the Senate Finance Committee Report, the statute was designed to

> tax life insurance companies on the basis of their investment income from interest, dividends, and rents, with suitable deductions for expenses fairly chargeable against such investment income.

H.R.Rep. No. 350, 67th Cong., 1st Sess. 14 (1921); S.Rep. No. 275, 67th Cong., 1st Sess. 20 (1921). Thus, under section 244, gross income was defined as "the gross amount of income received during the taxable year from interest, dividends, and

---

**5.** While a bad debt might also qualify as a section 162 expense for an ordinary business taxpayer, the term investment expense has been judicially interpreted, as will be shown, to exclude bad debts or losses on investments themselves.

**6.** *See* Revenue Act of 1913, ch. 16, 38 Stat. 114, § II G(a); Revenue Act of 1916, ch. 463, 39 Stat.

756, §§ 10 & 12; Revenue Act of 1918, ch. 18, 40 Stat. 1057, §§ 230, 233 & 234.

**7.** While life insurance companies were allowed the same deductions as ordinary corporations, they were often given additional deductions which recognized their unique status. *See e.g.,* Revenue Act of 1918, ch. 18, 40 Stat. 1057, § 234(a)(10).

rents." Net income was defined as gross income less nine specifically enumerated deductions. § 245(a)(1)–(9). One of these deductions was for "[i]nvestment expenses paid during the taxable year." § 245(a)(5). No deduction was expressly provided for bad debts or ordinary losses.

From 1921 through 1953, the treatment of gross income and investment expenses was reenacted without substantial change in the Revenue Act of 1924, ch. 234, 43 Stat. 253, §§ 244, 245; Revenue Act of 1926, ch. 27, 44 Stat. 9, §§ 244, 245; Revenue Act of 1928, ch. 852, 45 Stat. 791, §§ 202, 203; Revenue Act of 1932, ch. 209, 47 Stat. 169, §§ 202, 203; Revenue Act of 1934, ch. 277, 48 Stat. 680, §§ 202, 203; Revenue Act of 1936, ch. 690, 49 Stat. 1648, §§ 202, 203; Revenue Act of 1938, ch. 289, 52 Stat. 447, §§ 202, 203; and the Internal Revenue Code of 1939 (26 U.S.C. 1952 ed.)

In the Internal Revenue Code of 1954, the language governing the investment expense deduction was amended slightly to include "[i]nvestment expenses paid or incurred during the taxable year." 26 U.S.C. § 803(g)(2). The legislative history reveals that "or incurred" was added merely to allow life insurance companies to treat certain items on the accrual basis, rather than on the cash basis of accounting. H.R.Rep. No. 1337, 83d Cong., 2d Sess. *reprinted in* 1954 U.S.Code Cong. and Ad.News 4017, 4380. Otherwise, the definition was "in substance *the same as in existing law.*" *Id.* (emphasis added).

This sequence of consistency is particularly illuminating considering that, prior to the enactment of the 1959 Act, it had long been held that life insurance companies could not deduct bad debts and losses, either as investment expenses or otherwise. *Equitable Life Insurance Co. of Iowa v. United States*, 340 F.2d 9 (8th Cir.1965); *Southland Life Insurance Co. v. Commissioner*, 30 B.T.A. 874 (1934); *Jefferson Standard Life Insurance Co. v. Commissioner*, 25 B.T.A. 1335 (1932), *rev'd on other grounds*, 72 F.2d 363 (4th Cir.1934); *Midland National Life Insurance Co. v. Commissioner*, 18 B.T.A. 1240 (1930). *See*

*also Helvering v. Manhattan Life Insurance Co.*, 71 F.2d 292, 293 (2nd Cir.1934) (life insurance companies are not allowed losses); *Prudential Insurance Co. of America v. Commissioner*, 33 B.T.A. 332, 336 (1935) (a life insurance company may not take loss deductions); 8 J. Mertens, *Law of Federal Income Taxation*, § 44.43 (Rev.1978).

In *Midland National*, the Board of Tax Appeals held that under the Revenue Act of 1924 a life insurance company could not deduct losses sustained as a result of the failure of certain banks in which the company held certificates of deposit for investment. In doing so, the Board compared the deductions allowed ordinary business corporations (§ 234) with those allowed life insurance companies (§ 245). The Board found the investment expense provision comparable to the ordinary and necessary expense provision allowed for ordinary corporations. Moreover, section 234 expressly contained a bad debt and a loss deduction provision for ordinary corporations, while section 245 contained no such provisions for life insurance companies. After noting that Congress had segregated the tax treatment of life insurance companies from ordinary business corporations, the Board stated its conclusion that

> we are not persuaded that the omission to provide for the deduction of losses and bad debts or depletion in the sections applying to life insurance companies was the result of inadvertence on the part of Congress, and the fact that these provisions have been three times reenacted without substantial change in this respect leads us to the conclusion that Congress intended that section 245 should and did contain all the necessary deductions from the specially defined income of a life insurance company which were necessary and equitable.

18 B.T.A. at 1244.

The *Midland National* rationale was applied in *Jefferson Standard Life Insurance Co. v. Commissioner*, 25 B.T.A. 1335 (1932), *rev'd on other grounds*, 72 F.2d 363 (4th Cir.1934). There, the Board held that

under the Revenue Act of 1926 an insurance company could not deduct losses resulting from the flooding of a plantation that had been acquired through the foreclosure of investment loans. Subsequently, in *Southland Life Insurance Co. v. Commissioner*, 30 B.T.A. 874 (1934), the Board again confirmed the view that losses or bad debts are not deductible by life insurance companies.

> Because of the peculiar character of the life insurance business, Congress has provided a method of taxation different from that applied to other corporations ... and ... it has made no provision for the deduction of losses or bad debts in computing the net income of life insurance companies ....

30 B.T.A. at 877.

In *Equitable Life Insurance Co. of Iowa v. United States*, 340 F.2d 9 (8th Cir.1965), the Court upheld a district court ruling that refunds of interest constituted ordinary losses and thus were not deductible by life insurance companies under the Internal Revenue Code of 1954. The appellate court stated:

> [t]here is nothing in the statutory scheme for taxation of life insurance companies during the period in question, to support the proposition that such companies were entitled as a matter of right to offset against, or exclude from their investment income losses which other taxpayers are permitted to deduct only as a matter of legislative grace.

340 F.2d at 14. The Court was especially cognizant that Congress had reviewed the taxation provisions for life insurance companies and had "not seen fit to place such companies on a comparable basis with other taxpayers ...." *Id.* Turning to the issue of whether such losses could be deducted as investment expenses, the Court first noted that the refunds of interest were properly characterized as losses for tax purposes. "This being so, there is no justification for artificially labeling such losses as investment expenses ...." *Id.* at 15.

This view was confirmed by the Sixth Circuit in *National Life and Accident Insurance Co. v. United States*, 385 F.2d 832 (6th Cir.1967), where it was held that refunds of interest on the redemption of government bonds were not deductible by a life insurance company. The Court noted that life insurance companies were taxed under special statutes that gave them tax benefits over other taxpayers, and that these statutes were to be "strictly construed." *Id.* at 833. The Court held that although the refunds would be deductible as ordinary losses by an ordinary taxpayer, the special statutes governing life insurance companies contained no provision for such a deduction. *Id.* at 834.

Thus, prior to the enactment of the 1959 Act, it had been well settled that life insurance companies were not allowed bad debt deductions. The question thus becomes whether Congress, by enacting the 1959 Act, intended to change the prevailing view by allowing life insurance companies a bad debt deduction. If so, then the appropriate question is in which phase is the deduction allowed. For the reasons that follow, the Court finds that Congress did not intend to expand the meaning of investment expenses, and therefore plaintiff's loan losses are not deductible as such. Congress did, however, intend that bad debts be deducted under the "other deduction" provision of section 809(d)(11) as modified by section 809(e).

While the 1959 Act dramatically changed the overall taxing scheme for life insurance companies, its treatment of investment yield in phase I was substantially similar to the treatment of investment income in prior statutes.[8] The only change in the investment expense deduction was from "investment expenses paid or incurred during the taxable year" under section 803 of the Internal Revenue Code of 1954, to "investment expenses for the taxable year" under

---

8. Except for the addition of capital gains under the 1959 Act, the treatment of gross investment income under section 804(b) of the 1959 Act was the same as under 803(b) of the 1954 Code. *See* 8 J. Mertens, *Law of Federal Insurance Taxation,* § 44A.05 (Rev.1978).

section 804 of the 1959 Act. As previously noted, Congress added "or incurred" in 1954 to facilitate a switch to the accrual method of accounting for certain items. Congress changed the language to "paid or accrued" in section 803 of the Life Insurance Company Tax Act of 1955. While the legislative histories of the 1955 and the 1959 Acts are bereft of explanations for the changes, certainly no reasonable interpretation of this minor change could support an argument that Congress intended to expand the definition of investment expenses so as to include bad debts.

■ Nor does any legislative history from the 1959 Act indicate any Congressional intent to change the prevailing view of investment expenses. To the contrary, the Senate Report accompanying the 1959 Act states:

> [804](c) Investment yield defined.—This subsection is substantially similar to subsection (c) as it appeared in the House bill. The new section 804(c) defines investment yield as gross investment income less the deductions enumerated in paragraphs (1) through (5) which generally constituted allowable investment expense deductions under the House bill *and existing law.*

S.Rep. No. 291, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. and Ad. News 1575, 1622 (emphasis added). While the affirmation of existing law is admittedly nebulous, it nonetheless contravenes the notion that Congress gave the term investment expense a newly expansive meaning. Congress is presumed to know the law, including the administrative or judicial interpretation of a statute. *Cannon v. University of Chicago,* 441 U.S. 677, 696–98, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979); *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978). Moreover, where "Congress adopts a new law incorporating sections of a prior law,

Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law ...." *Lorillard v. Pons,* 434 U.S. at 581, 98 S.Ct. at 870. Given the unanimity of the cases that had held that bad debts and loss deductions were not available to life insurance companies prior to the 1959 Act, this Court will not expand the meaning of the term investment expenses so as to include bad debts absent some affirmative act by Congress to change the meaning. *See Florida National Guard v. Federal Labor Relations Authority,* 699 F.2d 1082, 1087 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

Plaintiff contends that since investment income is recognized under section 804(b), investment losses should be deductible under section 804(c). Plaintiff contends this symmetry is required by the structure and design of the 1959 Act. This Court disagrees. Gain from the sale of a non-capital investment asset is not investment income under section 804(b); it is gain from the sale of property other than a capital asset and is includable in gain from operations under section 809. *Pacific Mutual Life Insurance Co. v. Commissioner,* 48 T.C. 118, 138–39 (1967), *rev'd on other grounds,* 413 F.2d 55 (9th Cir.1969). It therefore is not anomalous to the structure and design of the 1959 Act to deduct also under section 809 an investment related bad debt.

In sum, Congress continues to segregate the treatment of life insurance companies from ordinary businesses. Section 804(c) continues to enumerate all of the deductions available to life insurance companies in determining investment yield. Four of these deductions are comparable to the deductions allowed an ordinary business taxpayer.[9] A provision allowing a bad debt deduction continues to remain conspicuous by its absence.

■ For the foregoing reasons, this Court finds that bad debts on investment

---

**9.** Investment expenses must be ordinary and necessary within the meaning of section 162. Treas.Reg. 1.804–4(a). The real estate and taxes deduction includes taxes "as defined in section 164." Treas.Reg. 1.804–4(b)(2). The depreciation deduction is, with certain exceptions, "iden-

tical to that allowed other corporations by section 167." Treas.Reg. 1.804–4(b)(3). The depletion deduction is "identical to that allowed other corporations by section 611." Treas.Reg. 1.804–4(b)(5).

loans are not deductible as investment expenses under section 804(c)(1).

### Non-Insurance Trade or Business Deductions

■ Plaintiff contends that it made these loans through its trade or business of making investments rather than its insurance underwriting business. Plaintiff contends that its ordinary investment operations constitute a "trade or business (other than an insurance business)" under section 804(c)(5), and that these loan losses are allowable as trade or business deductions. This Court disagrees.

Initially, it is clear that if plaintiff's investment activities constitute a trade or business (other than an insurance business), the bad debts would be deductible under section 804(c)(5). Under that section, "the deductions allowed by subtitle A of the Code" which are attributable to a non-insurance trade or business are allowable as deductions from gross investment income. Treas.Reg. 1.804–4(b)(6)(i).[10] The question, then, turns on the meaning of the phrase "trade or business (other than an insurance business)."

Plaintiff contends that "an insurance business" should be interpreted narrowly to include only its underwriting activities. By this view, the activities of the plaintiff in investing the premium receipts from its policyholders would not be part of "an insurance business." The phrase is not as unambiguous as plaintiff contends. From the earliest, Congress recognized the important role that investment operations played in an insurance business. Indeed, as has been shown, for almost forty years life insurance companies were taxed only on their investment income and not on their underwriting income. Currently, investment income continues to be a primary factor in the taxation of life insurance companies as a component of life insurance taxable income under section 802.

Furthermore, to interpret "trade or business (other than an insurance business)" as including plaintiff's investment operations would be to render unnecessary sections 804(b)(1) and 804(c)(1), (2), (3) and (4). If all investment income was also section 804(b)(3) income, then section 804(b)(1) would be superfluous.[11] Moreover, if plaintiff's investment activities are considered a non-insurance trade or business, then the investment expense provision of section 804(c)(1) also becomes superfluous.[12] The trade or business deduction provision of section 804(c)(5) is much broader in scope than the investment expense provision. If both applied to the plaintiff's investment activities, there would be no need for the latter.

The legislative history indicates that Congress considered a life insurance company's investment activities to be part of an insurance business. The phrase was introduced in the Life Insurance Company Tax Act of 1955. The committee report that accompanied the Act emphasized that "[n]ormally a life insurance company will *only* have income from a noninsurance business when it acquires a going business in foreclosing a mortgage." H.R.Rep. No. 1098, 84th Cong., 2nd Sess., *reprinted in* 1956 U.S.Code Cong. and Ad.News, 2272, 2277 (emphasis added).

Based on the record before this Court, it is clear that plaintiff's investment activities are a central and integral part of the plaintiff's insurance business. Investment income serves to reduce the amount of premi-

---

**10.** Section 166, which allows ordinary businesses a deduction for bad debts, is within Subtitle A of the Code.

**11.** To be sure, the Treasury regulations provide that "any interest, dividends, rents, and royalties received by any trade or business (other than an insurance business) ... is included in the life insurance company's gross investment income by reason of section 804(b)(1) ...." Treas.Reg. 1.804–4(b)(6)(i). This, however, does not contravene the fact that if normal investment oper-

ations—*the very activity that normally gives rise to section 804(b)(1) income*—is deemed also to generate section 804(b)(3) income, then section 804(b)(1) is unnecessary. Rather, the cited regulation has relevance only if plaintiff's investment activities are considered to be part of an insurance business.

**12.** The same is true for the section 804(c)(2), (3) and (4) provisions.

ums which plaintiff must charge its policy-holders. By plaintiff's own admission, maximizing investment income is required for the plaintiff to be competitive with other insurance companies. Moreover, a sound investment strategy is necessary to assure that plaintiff will be able to pay policy claims as they arise.

Plaintiff's reliance on *Pacific Mutual Life Insurance Co. v. Commissioner*, 48 T.C. 118 (1967), *rev'd on other grounds*, 413 F.2d 55 (9th Cir.1969) is unpersuasive. There the taxpayer had received a payment for issuing an option to purchase or lease real property; the option was never exercised. The taxpayer had also received payments for issuing bond and mortgage standby commitments; the bonds and mortgages were never made. The issue was whether the payments should have been included in income as gross investment income or in determining gain from operations. With little discussion, the Tax Court was "satisfied that from the record," that the fees had been "derived from petitioner's business activities and that such activities were wholly unrelated to petitioner's insurance business." *Id.* at 138.[13] The extent to which this case supports plaintiff's position is questionable. Later in the decision, the Tax Court was faced with the question of the proper treatment of the gain from the sale of United States Treasury bills. After determining that the gain was not section 804(b)(1) income, the Court held that the income was to be included in gain from operations under section 809. The Court did not hold that the income was attributable to a non-insurance trade or business. Thus the case does not support the proposition that plaintiff's normal investment activities constitute a trade or business other than an insurance business.

■ Finally, the plaintiff contends that there is at least a triable issue of fact on

whether it was a partner in a partnership when it made the Texas Consolidated Oils loan. Section 804(c)(5), however, provides for deductions "which are attributable to a trade or business (other than an insurance business) carried on ... by a partnership of which the life insurance company is a partner...." Thus, *merely being a partner in a partnership does not qualify plaintiff under the section.* The partnership must carry on a non-insurance trade or business. The plaintiff admits that the transaction was "carried out in the ordinary course of its investment operations." Since the plaintiff's ordinary investment activities do not constitute a non-insurance trade or business, plaintiff is not entitled to a section 804(c)(5) deduction merely because it acted with two other entities.

Accordingly, the defendant's motion for summary judgment is granted, and the plaintiff's cross motion for summary judgment is denied. The Clerk will dismiss the complaint.

---

**13.** Plaintiff contends that the government's position in this case contradicts its position in *Pacific Mutual.* This contention is not supported by the record. While it is true that the notice of deficiency sent to the taxpayer in *Pacific Mutual* stated the fees were income "includable under either section 804(b)(1) or 804(b)(3)," the Court's opinion suggests that, in the Tax Court, the government argued only that the income was includable under section 804(b)(1). *See Pacific Mutual,* 48 T.C. at 137–38. Furthermore, at oral argument here, defense counsel stated that he had checked the briefs filed in *Pacific Mutual* and the government had not argued that the income from the loan commitments was non-insurance trade or business income.