AMERICAN MUTUAL LIFE INSUR-
ANCE COMPANY AND SUB-
SIDIARIES, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–174T.

United States Court of Federal Claims.

Corrected Version Filed April 13, 2000.

Original Version Filed March 16, 2000.[1]

Norman Sinrich, Nancy W. Pierce, Gary J. Ostrow, Denise M. Mendt, Chadbourne & Parke LLP, for Plaintiff.

Mildred L. Seidman, Robert J. Higgins, Department of Justice, for Defendant.

1. This opinion was originally issued on March 16, 2000, and contains two non-substantive technical corrections which do not in any way affect the Court's ruling. "Alternative minimum tax" has been changed to "alternative tax" on page 454 and 457.

## OPINION

BASKIR, Judge.

This is a suit by American Mutual Life Insurance Company, formerly known as Central Life Assurance Company, for refund of federal income taxes for the years 1988 and 1989. The refund claims involve the Tax Benefit Rule, which is currently codified in part as § 111 of the Internal Revenue Code of 1986.

The question before the Court is whether § 111 serves to exclude from income certain decreases in life insurance reserves otherwise required to be included as income under the Code.

■ Oral arguments on cross-motions for summary judgment were first held before Judge Robert H. Hodges in June 1998. The case was subsequently transferred here, and additional argument was heard. Post argument briefs were then submitted. In a federal income tax refund suit the taxpayer has the burden of overcoming the presumption that the Commissioner's determinations are correct as a matter of law. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Transamerica Corp. v. United States*, 902 F.2d 1540, 1543 (Fed.Cir.1990). We conclude that the plaintiff has failed to persuade us that the Tax Benefit Rule applies to these transactions and that if it did, American Mutual would benefit. We therefore grant the government's motion and deny the plaintiff's.

## INTRODUCTION

We will begin our review of the issues by summarizing the Tax Benefit Rule. We will then examine the plaintiff's tax history, and the very arcane tax rules that applied to life insurance companies between 1959 and 1983. We will then set forth our analysis.

### 1. *Tax Benefit Rule*

The Tax Benefit Rule, partially codified in § 111 of the Internal Revenue Code of 1986, recognizes that the annual tax reporting system may create inequities when applied to transactions that cross taxable years. It attempts to create better tax equity by making the income tax consequences of the later event to some degree depend on the prior related tax treatment. *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 381, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983).

■ There are two aspects to the Tax Benefit Rule. The inclusionary component is judge-made. See Thomas J. Mahoney, Jr., *The Tax Benefit Rule After Hillsboro*, 37 Case Western Reserve Law Review 362 (1986). It requires a taxpayer that deducts an amount from income in one year and recovers the deducted item in a later year to include the recovered amount in income. *Hillsboro*, 460 U.S. at 405, 103 S.Ct. 1134; *Alice Phelan Sullivan Corp. v. United States*, 180 Ct.Cl. 659, 381 F.2d 399 (1967). The exclusionary component permits a taxpayer to exclude from income amounts recovered after a previous deduction if the deduction generated no tax benefit. *Dobson v. Commissioner*, 320 U.S. 489, 507, 64 S.Ct. 239, 88 L.Ed. 248 (1943). The exclusionary component codified by § 111(a) states:

Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by this chapter.

The provision first took legislative form as § 22(b)(12) of the 1939 Code. Although it has been modified a number of times since then, for our purposes it can be considered unchanged.

In this case, we are concerned only with the exclusionary aspect of the Rule. That is because the Code itself in § 809(c)(2) as amended in 1984, and not the application of the Rule, specifically directs that the tax items at the center of this case—decreases in life insurance reserves following previously deducted increases—must be included in income.

During the second oral argument, counsel for American Mutual expressed the belief that the Tax Benefit Rule was a general rule of transactional equity, designed to correct tax inequities caused by the annual tax reporting of transactions that crossed tax years. With equal conviction, counsel for the government expressed the view that the Tax

Benefit Rule is designed to address inequities only in a *limited class* of transactions that cross tax years.

The government has the better of this conceptual argument. The Supreme Court in *Hillsboro* rejected an application of the Rule that would institute a transactional tax reporting system in place of the annual system. 460 U.S. at 420–22, 103 S.Ct. 1134. *See also, Burnet v. Sanford & Brooks Co.,* 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931); and Mahoney, *The Tax Benefit Rule After Hillsboro,* 37 Case W. Res. L.Rev. at 370. The *Hillsboro* Court agreed that the Rule applies only to a class of transactions, but divided on how to define that class. To our knowledge, no recorded case in the Rule's more than 70–year judge-made and then statutorily-embodied history applies the Tax Benefit Rule in the manner sought by plaintiff. As we shall see, the Tax Benefit Rule's tests, definitions, and descriptions used in these cases apply awkwardly, if at all, to the special characteristics of life insurance reserve increases and decreases. Moreover, the structure of life insurance taxation itself embodies transactional equity, obviating the need for the Tax Benefit Rule. The plaintiff's theory amounts to an extension of the Tax Benefit Rule beyond what has been its customary circumstances.

### 2. Taxation of Life Insurance Companies

The taxation of life insurance companies is an arcane subject and is *sui generis.* The legislative approach has gone through major changes over the years. Before examining the tax structures enacted in 1959 and 1984, which are directly implicated in this litigation, it would be helpful to offer some very general observations about the history of life insurance taxation to place our later discussion in context. We are indebted to William B. Harman, Jr., *The Structure of Life Insurance Company Taxation—The New Pattern Under the 1984 Act—Part I,* Journal of the American Society of CLU, Vol. 39, No. 2 (March 1985), upon which we base this summary.

Over the years, Congress has wrestled with a number of interrelated issues with respect to life insurance taxation, among them whether to include premiums—underwriting income—within the tax base along with income from investment; and if so, to what extent; how to treat life insurance reserves; and what tax treatment to give dividends paid by mutual companies. In addressing these issues, Congress has sought to recognize the special nature of the life insurance industry; and to achieve equity in the tax treatment of the industry as compared with companies in other commercial areas. And it has sought to achieve a proper allocation of the tax burden between stock life insurance companies and mutual life insurance companies.

In general, to be taxed as a life insurance company, a company must be an insurance company; issue life insurance and related contracts, and more than 50% of its reserves must be life insurance reserves. Initially, from 1913 through 1920, life insurance companies were taxed on their total income under the same provisions that applied to all business corporations. However, in the 1921 Code, the tax base was changed to encompass only investment income, leaving untaxed underwriting income entirely. Then, in 1959, the Code expanded the tax base to include underwriting income, but limited that aspect of income by a number of devices which we will outline presently. Finally, in the Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, Congress continued the inclusion of underwriting income in the tax base, but changed drastically how the deductions would be determined. See H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2 at 106–162 (1984), U.S.Code Cong. & Admin.News p. 697.

Life insurance reserves present unique tax considerations. These reserves are the essential characteristic of the industry; in the Code they form the very definition which determines whether a taxpayer is subject to life insurance tax provisions, or those applicable to other insurance entities, or to corporations, generally. § 816(a). From the beginning, life insurance reserves were recognized for tax purposes. If nothing else, the role of reserves as a tax item for the industry constitutes the recognition that, upon issuance of a policy, the company has

an immediate and continuing obligation to pay policyholder, an obligation—estimated though it may be—that must be recognized for tax purposes. *United States v. Atlas Life Insurance Company*, 381 U.S. 233, 249, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965).

Dividends present a special issue as between mutual and stock life insurance companies. As a general tax matter, dividends are considered distributions to corporate owners and are taxed at the corporate level. By contrast, distributions to customers are deductions, since they are essentially rebates on charges. But for mutual life insurance companies, the customers are the owners. What, then are dividends? In order to achieve equity between mutual and stock companies, the Code has sought to apportion dividends, and limited the amount that can be deducted. In the 1959 Act, as we shall see, the limitation was framed in relation to underwriting income only. In the 1984 Act, dividends are limited by an amount determined by an assumed rate of return on equity.

American Mutual proposes to over-lay these shifting and very complex policy expressions with the Tax Benefit Rule, thereby effectuating major changes in life insurance taxation. We take to heart the instruction from *Hillsboro* that we look to the legislative intent of the tax scheme, here Subchapter L, part 1, in deciding whether the Tax Benefit Rule is implicated.

### A. *Life Insurance Taxation—The 1959 Act*

Under the laws governing life insurance companies, each time a company issues a policy it must set up a reserve to pay the benefits under the policy and must add to the reserve each year until it is adequately funded under state law. During the tax years 1962 through 1978, and again in 1981, the plaintiff had aggregate net increases in every year. Pursuant to the Internal Revenue Code of 1954, as amended by the Life Insurance Company Income Tax Act of 1959, Subchapter L, part 1, in the calculation of life insurance company taxable income (LICTI), net additions to the reserves over the previous year's amount were treated as deductions. § 809(d)(2); annual net decreases in reserves were added to income.

§ 809(c)(2)—both as respects gain from operations income. Further, the amount of total reserves, including net annual changes, also functioned as another deduction as respects investment income. § 805(a).

American Mutual contends that it essentially received no tax benefit from a portion of the increases in the past years 1962–1981, and so the Tax Benefit Rule should relieve it of the requirement that the entire amounts of the decreases now be added to income. It estimates the excluded amounts as $12 million in 1988 and $10 million in 1989.

The matter is, of course, not nearly that simple, and we must examine in more detail the tax scheme governing life insurance companies during the first period, when American Mutual had net increases in reserves. Understanding that scheme, mercifully now defunct, is no easy matter.

The 1959 Tax Act, in effect during the years to which the plaintiff seeks to apply the Tax Benefit Rule, was a complex and obscure statute. It has been described as a "conspiracy in restraint of understanding." *Lincoln Nat'l Life Ins. Co. v. United States*, 217 Ct.Cl. 515, 523 n. 1, 582 F.2d 579 (1978). In describing this scheme, we pay special attention to the treatment of reserves and related tax items, ignoring other complexities not involved in this litigation. Section references throughout this decision are to the 1959 Act, unless otherwise specified.

The Act had a bifurcated, yet interrelated system of taxing life insurance companies that distinguished between investment and underwriting income and calculated them differently. Conceptually, however, the Code imposed a tax on the net investment income (less a standard deduction of $250,000), plus 50% of underwriting income that exceeded the investment income. If underwriting income was less than investment income, the tax was imposed on the lesser amount. To determine tax liability, a life insurance company had first to calculate investment income, then calculate underwriting income. Throughout the 1962–1981 period, American Mutual was taxed only on its investment income.

*Investment Income:*

To be more precise, § 802(b) imposes a tax on the lesser of net investment income and gain from operations. § 804(a) calculates the company's taxable investment income by excluding the policyholders' share of the investment yield. The investment yield is the gross investment income less certain expenses. § 804(c). The policyholders' share of the investment yield is determined by calculating a fraction. Part of the numerator of that fraction is "the policy and other contract liability requirements," one element of which is life insurance reserves. § 805(a). The numerator is divided by the investment yield. Therefore, an increase in reserves results in an increase in the percentage of the investment yield which is allotted to the policyholders and is taken out of the insurance company's taxable investment income. Reserves thus operate as a deduction, although each dollar of the tax item has only a fractional impact in reducing the company's share of investment income. American Mutual's counsel advises us that this fractional deduction is unusual, perhaps unique to the 1959 Act.

Note that here we are talking about the full reserves, not only the amount of annual increase. In any given year, the reserves tax item is the mean between the level at the start of the year and at the end. § 805(c)(1)(A). Put another way, the amount entered is the amount at the beginning of the year plus half the increase at year's end. Of course, in the next year, the new initial base amount is the entire amount as of the end of the previous year, including the balance of the previous year's increase.

Thus, as the government points out, each succeeding year that same total reserve amount from the original year—base plus annual increase—would be part of the fraction again. Since the plaintiff's net reserves increased each year from 1962 through 1978, each dollar of the increase in the reserve in 1962 was again part of the fraction in each of the 16 years to 1978. Each dollar in 1963 that exceeded the 1962 amount would be part of the deduction in each of the next 15 years, and so on. In fact, those 1962 dollars were also part of the deduction in each of the years after 1978 until, if at all, the reserves fell below the 1962 level. The other years operated the same way.

The plaintiff readily concedes that it thus had a repeated benefit from each year's net additions to reserves on the investment income side of the tax calculation. The parties dispute the size of that benefit, with American Mutual contending it amounts to a few cents on the dollar ($295,000 over the period) and the government arguing a larger amount ($3 million). But they do agree it was more than nothing, if not a full dollar's worth for each dollar of reserve increase.

*Underwriting Income ("Gain from Operation"):*

Although what plaintiff characterizes as "Phase II" is commonly referred to as underwriting income, the Code used the term "gain from operations" (GFO). § 809(b) sets forth the calculation of GFO as the company's share of investment yield (essentially the same taxable investment income), capital gains (which are not involved in this dispute), decreases in reserves (of which there were none during the 1962–78 period), and premiums on life insurance policies (underwriting income).

From this gross amount subsection (d) lists eleven deductions; important for our purposes are the deductions for death benefits (d)(1), reserve increases (d)(2), and dividends paid to policyholders (d)(3). The dividends-paid deduction is limited to the amount that underwriting income exceeds taxable investment income. Subsection (f). Once underwriting income was reduced to parity with investment income, dividend deductions had no tax effect. They were, in plaintiff's parlance, "unused deductions." As we shall see, there is an intimate connection between these "unused" dividends and the reserve decreases that American Mutual seeks to exclude from its post–1984 income as having provided no tax benefit.

The company, we recall, was taxed on taxable investment income plus half the amount that GFO exceeded taxable investment income. § 802. Thus, the GFO derived after subsection (d) deductions had to be further adjusted by subtracting the company's share

of investment yield or its taxable investment income. This essentially reverses the calculation for gross GFO that began this description. Compare § 802(b)(2) and § 809(b). After these calculations are complete, GFO for tax purposes is effectively only the (net after deductions) premiums received from life insurance policies.

### 3. Tax Benefit Rule—American Mutual's Theory

Plaintiff's counsel describes the investment income portion of the tax scheme as Phase I, and the GFO/underwriting portion as Phase II, borrowing this terminology from the Supreme Court's opinion in Atlas, 381 U.S. at 236 n. 2. He calls his client a "Phase I taxpayer" because during the 1962–81 period it paid taxes only on investment income. While true as a conclusory statement, it obscures the otherwise unremarkable fact—as made abundantly clear in its tax returns and in our technical description—that American Mutual, like all life insurance companies, had always to calculate the underwriting aspect in order to determine what it would be taxed upon.

That American Mutual's underwriting or GFO income in these years fell to the level of the investment income was due in whole or in part, of course, to the deductions for reserve increases that American Mutual took against underwriting income. In fact, a review of American Mutual's tax returns showed that it deducted every dollar of its reserve increases, and still had "excess" underwriting income which was further reduced by dividend deductions (though in 1979 and 1980 it did not have a reserve increase to deduct). In this sense, at least, it took full .dollar-for-dollar deductions for its reserve increases.

The plaintiff argues that the amount of net reserve decrease it may exclude from income is a calculation to be left to the damages stage of this litigation. In anticipation, however, it has proffered a theory of calculation involving the underwriting formula to determine the tax benefit exclusion. It has "traced" reserve increases during the 1962–1981 period and identified the corresponding policy releases in 1988 ($12 million) and 1989 ($10 million). Plaintiff's theory may be summarized as follows: In order to determine

whether the reserve increases in a given previous year (say, 1962) had any tax benefit, it recalculated its underwriting income as though there were no deductions for the reserve increases taken that year that were released in a subsequent year (say 1988). Normally, canceling out a deduction has the natural effect of increasing taxable income. If this were to happen here, it would be obvious that the reserve deduction did indeed confer a tax benefit. If there is no change in taxable income, the "deduction" had no tax effect. Ergo, Tax Benefit Rule exclusion.

And that is what happens when American Mutual recalculates underwriting income for 1962. Having a larger provisional underwriting income, American Mutual can now deduct additional previously "unused" dividends before it bumps into the 809(f) cap. The end result, of course, is that GFO remains the same as before. Therefore, American Mutual reasons, the reserve releases in 1988, had they happened in 1962, would not have affected underwriting income. American Mutual thus concludes that the reserve increases it has later released conferred no tax benefit in 1962.

American Mutual's theory of unused reserve deductions is at bottom based on backing out the reserve release deductions in each year and replacing them with additional, previously unused dividend deductions so long as these dividends are available for deduction. In this way, it limits its calculation of any year's "non-beneficial" reserve deduction by the available but unused dividend deduction, or the available reserve deduction, whichever is smaller.

Plaintiff maintains that in thus applying the Tax Benefit Rule, it is merely following the methodology required by Allstate Ins. Co. v. United States, 936 F.2d 1271 (Fed.Cir. 1991), and other cases. It simply recomputed its earlier tax returns as though the reserve releases in 1988 and 1989 had occurred in the year of the corresponding reserve increase. Changes in the amounts of particular deductions are simply the product of applying the Tax Benefit Rule and Subchapter L provisions. And it persists in characterizing this theory as a "damages" calculation, not connected to the liability stage.

The government has a number of problems with the plaintiff's computations. But its major objection is that by using the available but disallowed dividend deductions as the measure of its non-beneficial reserve deductions, the plaintiff is avoiding the dividend limitation of § 809(f). The only way that one can conclude that the recomputation provides no tax benefit is because of the existence of non-deductible dividends. If there were no limitation and dividends had been fully deducted originally, any reduction in the reserve deduction would have the direct effect of increasing GFO. Or, if the dividend deduction were insufficient to run into the § 809(f) limitation—the available amount had been fully deducted—then, again, the reduction in reserve deduction would increase GFO. In both cases, the original reserve increase thus would be seen to have served to reduce GFO. In the end, it is only the presence of available but hitherto non-deductible dividends that appears to demonstrate that the decrease in deduction attributed to the released reserves has no effect on taxable income—that it had been, in American Mutual's view, a deduction with no tax benefit.

The government misses no opportunity to protest that this intimate connection between reserves and dividends in plaintiff's theory amounts to an avoidance of the dividend limitation. It argues that this is not merely a computation, but the essence of American Mutual's Tax Benefit Rule theory, and there is merit to this argument. The government points out that American Mutual's returns show that it deducted every dollar's worth of reserve increases during those years. And when they were deducted, the returns demonstrate that American Mutual got a full dollar's worth of reduction in underwriting income. It could not demonstrate in any of those years that any portion of the deduction for reserve increase failed to give a tax benefit.

On the other hand, as we have noted, the plaintiff views the underwriting computations as a matter of damage calculation only, and not relevant to liability. We take the plaintiff at its word. We will not base our decision on an analysis of the impact of reserve increases and releases on the calculation of underwriting income and the dividend cap. But if we were to do so, our conclusion would be the same.

### 4. Tax Benefit Rule—Inapplicable

■ We reject American Mutual's theory for two major reasons—the Tax Benefit Rule is inapplicable to the transactions under consideration; and even if the Rule were to apply, American Mutual would not benefit from it. The Rule is not a general rule of equity applicable to all transactions that cross tax years. It has been applied to a limited set of transactions. Annual variations in life insurance reserves do not fit within this class of events, nor do they meet the Rule's preconditions and tests. Moreover, American Mutual received the full statutory tax benefit from the reserve in determining its investment income under the 1959 Act and is not entitled to additional benefits even if the Rule were to be applied.

The Tax Benefit Rule has been applied to a classic but limited set of tax items and transactions. The rule was first judicially recognized in 1929, *Excelsior Printing v. Commissioner*, 16 B.T.A. 886, 1929 WL 532, and adopted by the Supreme Court in 1943, *Dobson v. Commissioner*, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248. It was originally created to provide some tax equity to situations where a bad debt deduction was followed some years later by recovery of that debt. Although debt payments are not considered income, it was appropriate to include the recovery in income in light of the previous deduction. But it would not be equitable to include it in income if it had not been a deduction in the first place.

Treasury regulation 1.111–1 lists illustrative tax items which are considered subject to the Tax Benefit Rule and those that are not. Included are such items as bad debts, prior taxes, delinquency amounts, war losses, all other losses, expenditures and accruals. Excluded are items such as depreciation, depletion and amortization. Life insurance reserves are quite different from losses, expenditures, or accruals.

The Rule has been applied to analogous tax items and situations, *e.g.: Hillsboro* (taxes paid and later refunded—bank had paid taxes for shareholders and taken deduction,

and taxes were subsequently refunded to shareholders; bank did not have to report refunded taxes as income because deduction was not inconsistent with subsequent events); *Tennessee–Carolina Transportation, Inc. v. Commissioner,* 582 F.2d 378, 382 (6th Cir. 1978) (Tax Benefit Rule applies when there is "recovery" or "inconsistent event;" therefore, taxpayer had to pay taxes on assets previously expensed but later acquired through a merger). We hasten to add that we do not think the Rule is applicable only in the cited examples. We take to heart the admonition in *Alice Phelan Sullivan Corporation* that the category of applications is not exclusive to those listed in the statute or cited in the regulations. 381 F.2d at 402. Nonetheless, with the possible exception of *Allstate,* which we discuss later, these cases do not address tax items such as life insurance reserves.

Similarly, annual variations in reserves are not the kind of "transaction" to which the Tax Benefit Rule has been applied. The regulation's definition of "recovery" speaks of "receipt of amounts" in respect of the deductions by sale or collection, refund, credit or cancellation. And the regulation's illustrative examples of collection or sale of a bad debt, refund or credit of taxes and the interest associated with the refund, and cancellation of taxes accrued, Treas. Reg. 1.111–1(a), have no analogous relevance if applied to the release of a reserve.

In considering the Rule, courts have used a variety of terms to describe the circumstances where it applied: "Unforeseen," "inconsistent premise," "a recovery." *Hillsboro National Bank,* 460 U.S. at 383–84, 103 S.Ct. 1134; *Tennessee–Carolina Transportation, Inc.,* 582 F.2d at 382; and *California and Hawaiian Sugar Refining Corporation v. United States,* 159 Ct.Cl. 561, 311 F.2d 235, 237–38 (1962). Indeed, the Rule itself reflects a tension between an annual reporting system and a transactional tax system. Mahoney, *The Tax Benefit Rule After Hillsboro,* 37 Case W. Res. L.Rev. at 367. The broader the class of circumstances where it applies, the more it operates to convert the Code to a transactional system. The terms used to describe and condition the Rule have a direct impact on this tension.

This was at the heart of *Hillsboro,* an inclusionary case, as the Court sought to strike the proper balance. The Court described and defined that middle ground as follows:

> The basic purpose of the Tax Benefit Rule is to achieve rough transactional parity in tax . . . and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of *assumptions that an event in a subsequent year proves to have been erroneous.* Such an event, *unforeseen at the time of an earlier deduction,* may *in many cases* require the application of the Tax Benefit Rule. We do not, however, agree that this consequence invariably follows. Not every unforeseen event will require the taxpayer to report income in the amount of his earlier deduction. On the contrary, the Tax Benefit Rule will "cancel out" an earlier deduction only when a careful examination shows that the later event is indeed *fundamentally inconsistent with the premise on which the deduction was initially based.* That is, if that event had occurred within the same taxable year, it would have foreclosed the deduction. . . .

460 U.S. at 383–84, 103 S.Ct. 1134 (emphases added; footnotes omitted).

We note first that the Supreme Court rejects counsel's conceptual view that the Tax Benefit Rule always applies when transactions cross tax years—"We do not, however, agree that this consequence [the application of the Tax Benefit Rule] invariably follows. . . ."

Life insurance reserves function under Subchapter L, part 1, just as Congress intended. Reserves have inherent tax benefits for the taxpayer. For one thing, they are necessary if a taxpayer is to qualify as a life insurance company under the Code and under state law. Reserves are defined by § 816(b) of the 1986 Code as amounts which are required by law, computed based on mortality or morbidity tables and interest rates, and set aside to mature or liquidate for payment of claims. The definition under the 1959 Act is similar. § 801(b). It is the existence of sufficient life insurance reserves which permits a taxpayer to take advantage

of the tax treatment accorded such companies.

A change in a life insurance reserve is quite different in character from the familiar Tax Benefit Rule circumstance. First of all, the creation of a reserve is not an "event" at all, but merely a bookkeeping entry reflecting the segregation of assets to account for an eventual, predictable liability. The liability is the amount that will have to be paid out when the policy matures, or otherwise terminates. Each year the reserve increases for that policy until the policy ends or the statutory limit is satisfied. The reserves are calculated according to formula employing the most exacting of assumptions and predictions.

Upon the death of the policyholder, cancellation of the policy, or its maturity, the policy terminates, a payment is made if required, the liability is extinguished, and the reserve is released in the same amount as its previous figure. If there is anything that is consistent and foreseen, it is that life insurance reserves will be released on the coming of one or another of a limited number of defined and inevitable events, the principal one being the certainty of death. Subchapter L reflects this "correct assumption." By its explicit terms in 1959 as in 1984, the initial deduction is zeroed out by the later addition to income. The release is an inescapable accounting entry, fully reversing a prior "temporary" entry. Conceptually, at least, over time the tax impact of the reserve transaction is neutral. The tax item that has a "permanent" impact is the deduction for death benefits, the actual paid liability. In this way, the Code accomplishes transactional equity.

In one sense, the release of a reserve might be considered as "inconsistent" with its earlier establishment, at least in the way that a negative is inconsistent with the positive it cancels out. And it is certainly true that the release of a reserve completes the earlier transaction such that it would "foreclose the deduction" if it had happened in the same year. But this says nothing more than that the establishment and later release of a reserve amount is a completed transaction that (usually) crosses tax years. It does not

establish this multi-year transaction as one qualifying for the Tax Benefit Rule.

Tax Benefit Rule transactions are described as "recoveries," a term not easily applied to reserve releases. § 111 is entitled "Recovery of Tax Benefit Items." A "recovery" is, at least in the classic Tax Benefit Rule examples, an amount paid to the taxpayer, an increase in assets. We have already made reference to the Regulation 1–111.1(a)(2) definition of a "recovery" which uses terms—such as receipt of amounts, sale, collection, and the like—that do not correspond to decreases in life insurance reserves. A "recovery" is what happens when a bad debt is collected, when state taxes are refunded or credited, when taxes accrued are canceled, or when a previous year's casualty payment is offset by a later subrogation receipt *Allstate*, 936 F.2d at 1275. Here, nothing is paid to the taxpayer when reserves are released. The taxpayer merely has an accounting or "book" change reflecting the reversal of a previous potential, estimated liability. In most cases, this discharge is accompanied by a payment of the exact liability—a reduction in assets.

The plaintiff relies heavily on *Allstate*. It contends that the case recognizes the application of the Tax Benefit Rule to insurance reserves. We think that the case reflects what we have called the classic application of the Tax Benefit Rule to a transaction pertinent to casualty insurance, and not to the situation presented by life insurance company reserve accounting.

In *Allstate*, the court concluded that the Tax Benefit Rule applied to receipts of subrogation and salvage recoveries, the final transactions common in casualty insurance. Upon submission of a casualty claim from an automobile insurance policyholder, the company would evaluate the claim and make an addition to its unpaid loss reserves, which operated as a deduction. The unpaid loss reserves reflected Allstate's potential future obligations. Allstate later paid many of those claims in sums different from the original claimed amount. Upon payment, Allstate subtracted the original amount it had estimated from the unpaid loss reserves, made an addition to income, and added the amount

actually paid to its paid losses account as a deduction. In this respect, the tax structure of Subchapter L, part 2 broadly parallels that of part 1.

But casualty insurance companies are not life insurance companies. After it paid the claim, Allstate could seek reimbursement from a third party (subrogation) or sell the damaged automobile for scrap (salvage). The amounts it received offset its earlier payouts, reduced the liability it entered earlier, and corrected the account for that claim. Subrogation recoveries reduced the losses incurred deduction and that increase had to be added to Allstate's gross income.

Allstate argued that it was improper to include as income that portion of the subrogation and salvage recoveries which related to earlier losses deducted without tax benefit because it had paid tax under the "alternative tax calculation for corporations." The .Federal Circuit noted that the Tax Benefit Rule allows a taxpayer to exclude from income amounts recovered from a previously deducted loss if the previous deduction generated no tax benefit. What was at issue in Allstate was whether the specific, detailed statutory direction that salvage and subrogation amounts were to be added to income could be modified by the Tax Benefit Rule's exclusionary component. The Circuit Court recognized that the salvage and subrogation recoveries were very much of the kind of tax items to which the Tax Benefit Rule usually applies. The fact that the amounts were included by statute, not by the Tax Benefit Rule, and were not called "deductions" and "income," did not preclude application of the exclusionary component. *Allstate*, 936 F.2d at 1274.

*Allstate* is not our situation. The Federal Circuit based its decision on the direct link it found between the loss deducted without tax benefit and the later subrogation recovery. The Federal Circuit stated that "[s]ubrogation is, by definition, a recovery from a previously deducted loss.... Subrogation, by its nature, demands application of the Tax Benefit Rule." 936 F.2d at 1274.

While the casualty insurance company used reserves to account for potential liability not unlike a life insurance company, the issue in the case was not the application of the Tax Benefit Rule to the reserves. Rather, it was the connection between the losses paid account and later recoveries by subrogation or salvage that adjusted the account payouts and recoveries. These "recoveries" meet all the Tax Benefit Rule tests. If American Mutual's case involved later adjustments to the deduction for death benefits, it would be analogous to *Allstate,* and our conclusion might be quite different. But American Mutual's situation does not involve recovery or recapture of previous amounts paid. Nothing analogous to subrogation or salvage is involved.

Although the *Allstate* Court uses the term "Tax Benefit Rule" generously throughout the opinion, the case also recognizes that insurance companies are unlike other corporations in that their income from premiums predates, often by many years, corresponding costs. Framed another way, Subchapter L itself adopts the multi-year transactional nature of the insurance business. But this transactional equity was "distorted" by the alternative tax, § 1201, which rendered nonbeneficial some $1.7 million of the losses paid deduction otherwise permitted by part 2. Consequently, the Tax Benefit Rule may be used in appropriate circumstances to modify or overlay the insurance tax scheme to restore that equity. *Id.* at 1275. But that does not mean the Tax Benefit Rule necessarily applies to reserve accounting, or to the transactions and circumstances of our case.

5. *The Tax Benefit Rule*—Unhelpful.

Plaintiff acknowledges that it had a tax benefit from its reserve increases "to the limited extent the reserve increases provided a benefit to [plaintiff] between 1962 and 1981 by reducing its investment income." Plaintiff's Brief in Support of its Motion for Summary Judgment, pp. 5–6. Even this limited tax benefit—and it might not be so limited— is sufficient to disqualify American Mutual from the exclusionary aspects of the Tax Benefit Rule.

The Rule, contrary to American Mutual's position, does not guarantee dollar-for-dollar reductions of taxable income for every dollar of deduction. Rather, the exclusionary as-

pect of the Rule is inapplicable if the taxpayer received the full benefit provided by the law. Counsel has not pointed us to any case that guarantees a "dollar-for-dollar" tax benefit, neither in his summary judgment papers nor in his post-argument submission. American Mutual certainly has not offered authority for applying the Tax Benefit Rule to provide more deduction than the explicit limit established by law.

The attentive reader will excuse a repetition of our earlier review of the 1959 tax scheme for mutual life insurance companies. We noted how the investment yield was divided between the company and policyholders. That division was accomplished by means of a fraction, the numerator of which included reserves. That reserve amount included the previous year's reserve plus the mean of the current tax year's increase. The larger the numerator, the larger the portion of investment income attributable to the policyholders, and correspondingly, the smaller the amount of company income. We also saw how the reserve increase in any given year remained as part of the amount that went into the succeeding years' calculations so long as reserves steadily increased each year, and—up to a point—even when they later decreased. Thus, the actual benefit American Mutual received from the reserve increase of any given year is greater than the pennies per dollar it suggests.

But the amount of the benefit is not pertinent. We quote again the exclusionary provision of § 111(a):

Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year *to the extent such amount did not reduce the amount of tax imposed by this chapter.* (emphasis added).

Although the reading is not 100% free from doubt, we understand the phrase "to the extent" to modify "reduce," and not to modify "amount of tax." Put another way, we read the section as stating that the exclusion component of the Tax Benefit Rule does not apply if there has been *any* reduction in taxes. We do not believe it sets up a proportional application of the Tax Benefit Rule,

effectively guaranteeing dollar-for-dollar reductions in tax.

Thus, we disagree with the plaintiff's assertion that if a $10 reserve deduction operated to reduce taxable income by only $1, a later reserve release of $10 necessarily required reporting income of only $1. In the 1959 Act, Congress concluded that $10 worth of reserve deductions would reduce taxable investment income by only (say) 10%. It is not for us to disturb that statutory decision.

This view is implicit in all discussions of the Tax Benefit Rule. And we find explicit support for our understanding in two cases: *California and Hawaiian Sugar Refining Corporation v. United States,* 159 Ct.Cl. 561, 311 F.2d 235 (1962) and *Alice Phelan Sullivan Corporation v. United States.*

In *California and Hawaiian Sugar Refining Corporation v. United States,* Judge Davis reviewed the application of the Tax Benefit Rule, in particular the anomaly of adding to income recoveries of items that could not properly be regarded as "income." In discussing the Rule, his terminology is instructive because he repeatedly refers to deductions that result in "a tax benefit of some sort" or "a reduction" of income tax, or "any tax benefit." We quote one such passage:

This principle is reflected in the many cases holding a refund of taxes includible in the taxpayer's income of the recovery year where *a prior tax benefit of some sort* has been found, but not in its absence. The same theory underlay subsection (b)(12) of Section 22 of the 1939 Code (added in 1942) which provided that income attributable to the recovery during the taxable year of bad debts, taxes, or delinquency amounts, for which a deduction had been allowed in a prior taxable year, would not be included in gross income to the extent that the prior year's deduction had not *resulted in a reduction* of the taxpayer's income tax. In short, where there was no prior tax benefit, the recovery was to be excluded from gross income. (emphasis added) (footnotes omitted).

311 F.2d at 237–38.

Furthermore, we read *Alice Phelan Sullivan* as controlling. This was a conventional

example of a recovered deduction—a charitable contribution made in earlier years, but returned in a later year. The taxpayer initially deducted the full amount and received a tax reduction of about $2,000, based on tax rates of 18% and 24% in the donation years.

However, in 1957, when the donations were returned and added to income under the Tax Benefit Rule, tax rates had risen to 57% and the resulting tax impact was correspondingly greater, now $4,500. The company failed in its effort to exclude the recovered amount to the extent it produced a greater tax impact than its earlier benefit.

The *Alice Phelan Sullivan* Court reconsidered an earlier case, *Perry v. United States,* 142 Ct.Cl. 7, 160 F.Supp. 270 (1958), which held that the tax recoupment should be no more than the earlier tax benefit, a "dollar for dollar" tax reduction. The *Alice Phelan Sullivan* Court paraphrased the *Perry* ruling as follows:

> The majority, concluding that the Government should be entitled to recoup no more than that which it lost, held that the tax liability arising upon the return of a charitable gift should equal the tax benefit experienced at time of donation.

381 F.2d at 400.

*Perry's* authority had been weakened in succeeding years and, however reluctantly, the *Alice Phelan Sullivan* Court now concluded "though equitable—[*Perry*] was otherwise without legal foundation." *Id.* at 401. It pained the judges, especially Judge Collins who wrote the opinion, to reverse *Perry,* and to impose this "harsh and inequitable result."

Citing *California and Hawaiian Sugar Refining Corporation,* the Court recapitulated the Tax Benefit Rule in the following terms:

> The only limitation upon that principle [of including the recovered deduction as income] is the so-called "tax-benefit rule." This rule permits exclusion of the recovered item from income so long as its initial use as a deduction did not provide a tax saving. But where *full tax use of a deduction* was made and *a tax saving thereby obtained,* then *the extent of saving is considered immaterial.* The recovery is

viewed as income to the full extent of the deduction previously allowed. (emphasis added) (footnotes omitted).

381 F.2d at 401–02.

The Court rejected a dollar-for-dollar adjustment in the Tax Benefit Rule to account for the great disparity between the original tax benefit and the later tax impact. The Court concluded its discussion by stating that the taxpayer had to apply "that tax rate which is in effect during the year in which the recovered is recognized as a factor of income." *Id.* at 403. In other words, the taxpayer is stuck with the current tax law. Similarly, American Mutual must treat this income item in accordance with the tax law as it exists in 1988 or 1989 or any year in which it now has reserve decreases, changes in rates and tax treatment notwithstanding.

We acknowledge that this view may impose a disproportionate tax impact on American Mutual. But that is a consequence of the 1984 amendments. Absent that statutory change, increases in reserves fractionally increase the policyholders' share, and reduce the company's taxable share of investment income; so, later reserve releases would have a roughly equivalent fractional effect in increasing the company's share of taxable investment income. So long as the 1959 Act is in force, there would be a rough balancing over time. Plaintiff candidly admits in note 2 of its posthearing submission that reserve increases and decreases "more or less offset each other" while the 1959 Act was in effect.

But the situation is drastically altered if the second transaction occurs under the 1984 Act. Here additions to income and reductions in deductions no longer have a fractional impact on investment income. Instead, they effect a direct dollar's worth of tax base. Thus, there would be a discrepancy between the prior fractional tax benefit of the reserve increase, and the tax impact if the full dollar of decrease must now be reflected in income.

Plaintiff, continuing its note, applies the Tax Benefit Rule now "to ensure that the tax consequences of increases and decreases in [its] reserves will be the same whether those increases and decreases occur in the same taxable year or in different taxable years."

During oral argument, counsel candidly stated that American Mutual seeks to apply the Tax Benefit Rule for post–1984 taxable years to avoid the more severe impact on its taxes caused by that legislative change. In effect, one might say American Mutual seeks to get a full dollar's worth of deduction where the 1959 Act had given it only a fraction.

Thus, in a manner of speaking, the "unexpected" and "inconsistent" event is not a conversion of a life insurance company to a mutual casualty company, IRS General Counsel Memorandum 35135 (November 27, 1972), or the recovery of interest previously paid, LTR (Tech.Adv.Mem.) 8127020 (March 31, 1981), or even the release of a reserve previously created. And it is not, as in *Allstate*, the imposition of the alternative tax in place of the multi-year transaction tax under Subchapter L, part 2. The inconsistent event for American Mutual is the change in tax law that imposed greater tax burdens for an item than hitherto it provided tax benefits.

Congress decided in 1959 that a dollar's worth of reserve net change should have less than a dollar's impact on investment income calculation. In 1984, Congress decided reserves should have a full dollar's impact on taxable underwriting and investment income. For American Mutual, now faced with reserve decrease additions to income, this is akin to the inequity of changing tax rates that concerned the court in *Perry*, and resolved in *Alice Phelan Sullivan*. We believe the same answer is required. The taxpayer must bear the burden of the law's change. *Beck v. Secretary of the Dep't of Health and Human Servs.*, 924 F.2d 1029, 1034 (Fed.Cir. 1991) ("Regardless of their merits, these policy arguments may be implemented only by Congress. Our study is limited to interpreting the statute as it was enacted, not as it arguably should have been enacted.").

The ultimate question in *Hillsboro* was whether the Tax Benefit Rule trumped the special non-recognition section—a matter of legislative intent. *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. at 398–99, 103 S.Ct. 1134. Following the Supreme Court's instruction, we conclude that Congress did not intend that the Tax Benefit Rule should alter the 1984 Act. In oral argument, counsel stated—without citing authority—that the Tax Benefit Rule would apply to override the 1984 changes unless Congress "specifically" provided otherwise. We think not. The 1984 changes replaced one complex tax structure with another, perhaps even more complex structure, involving among other things, computations in two tax years. See *American Mutual Life Insurance Co. v. United States*, 43 F.3d 1172 (8th Cir.1994). The 1984 Act followed a year's study by Congress and was an effort to achieve a more equitable and effective system of life insurance taxation. H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2 at 1396 (1984).

Congress recognized the change in tax scheme might result in possible inequities, especially increases in company taxable income. It provided a remedy in the form of a reduced tax rate for life insurance companies. In words that address our situation directly, the House Report stated:

> In redesigning the statutory scheme for taxation of life insurance companies, the committee was concerned that the new provisions not unduly prejudice companies by suddenly increasing their tax liability by substantial amounts. Although the committee was concerned that deductions which do not reflect economic expenses generally are inappropriate, it nonetheless concluded that the difficulties which might result from a sudden increase in the industry's tax burden warranted an exception in this case. Thus ... the committee bill provides an across-the-board rate reduction for life insurance companies which will cushion the impact of the new rules and assure their tax-related competitive position relative to other financial intermediaries, and other tax-exempt entities in direct commercial competition with life insurance companies.

H.R.Rep. No. 432, 98th Cong., 2nd Sess., at 101 (1984).

We do not believe Congress intended to overlay the Tax Benefit Rule onto this structure, thereby making unexamined and unpredictable changes in the new system of life insurance industry taxation.

458

## CONCLUSION

We conclude that American Mutual may not apply the Tax Benefit Rule so as to exclude from income portions of the reserves it has decreased in 1988 and 1989, and is not entitled to a refund by virtue of the Tax Benefit Rule.

Defendant's motion for summary judgment is hereby GRANTED, and plaintiff's motion for summary judgment is hereby DENIED. The Clerk of the Court is directed to enter judgment in favor of the defendant, and the amended complaint is dismissed. Parties will bear their own costs.

IT IS SO ORDERED.